Marc Toberoff (S.B. #188547)
*mtoberoff@toberoffandassociates.com*
Jaymie Parkkinen (S.B. #318394)
*jparkkinen@toberoffandassociates.com*
TOBEROFF & ASSOCIATES, P.C.
23823 Malibu Road, Suite 50-363
Malibu, CA 90265
Telephone: (310) 246-3333
Facsimile: (310) 246-3101

*Attorneys for Defendants,*
*Michele Hart-Rico and*
*Buz Donato F. Rico III*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARVEL CHARACTERS, INC., <br><br> Plaintiff, <br><br> v. <br><br> MICHELE HART-RICO and BUZ DONATO F. RICO III, <br><br> Defendants. | Case No. 2:21-cv-07624-DMG-KES <br><br> [DISCOVERY DOCUMENT: REFERRED TO MAGISTRATE JUDGE KAREN E. SCOTT] |
| MICHELE HART-RICO and BUZ DONATO F. RICO III, <br><br> Counterclaimants, <br><br> v. <br><br> MARVEL CHARACTERS, INC. and DOES 1-10, inclusive, <br><br> Counterclaim-Defendants. | **JOINT STIPULATION ON THE RICOS' MOTION TO COMPEL MARVEL CHARACTERS, INC.'S PRODUCTION OF DOCUMENTS** <br><br> Hearing Date: September 6, 2022 <br> Time: 10:00 a.m. <br> Courtroom: 6D <br><br> Non-expert Discovery Cutoff: November 18, 2022 <br> Pretrial Conf.: May 9, 2023 <br> Trial: June 6, 2023 |

# **TABLE OF CONTENTS**

I.   THE RICOS' INTRODUCTION ..................................................... 1

II.  MARVEL'S INTRODUCTION ...................................................... 4

III. THE RICOS' CONTENTIONS ...................................................... 7

    A.   STATEMENT OF THE ISSUES ............................................... 7

    B.   LEGAL STANDARD ........................................................ 10

    C.   MARVEL'S "INSTANCE AND EXPENSE" DEFENSE ..................... 10

    D.   THE ISSUES IN DISPUTE ................................................. 12

        1.   Marvel Must Produce Agreements with Don Rico in the Focus
        Period. ..................................................................... 12

        2.   Marvel Must Produce Documents Concerning Payments to and the Tax
        Treatment of Don Rico and Lee in the Focus Period. ................. 16

        3.   Marvel Must Produce Documents Evidencing Its Alleged Legal Right
        to Control Don Rico's Creation of the Works. ........................ 23

        4.   Marvel Must Produce Relevant Correspondence with Lee Concerning
        Don Rico. ................................................................ 25

        5.   Marvel Must Produce Documents Evidencing Don Rico and Lee's
        Working Status. .......................................................... 27

        6.   Marvel Must Produce Plots, Scripts, or Outlines Relating to the
           Works. ................................................................. 31

IV.  MARVEL'S CONTENTIONS ...................................................... 33

    A.   THE MOTION SHOULD BE DENIED BECAUSE DEFENDANTS FAILED TO MEET
    AND CONFER ON THE ISSUES PRESENTED. ...................................... 33

    B.   DEFENDANTS' SPECULATIVE AND UNSUPPORTED MOTION SHOULD ALSO
    BE DENIED ON ITS MERITS. ................................................... 35

1.  Defendants Misleadingly Frame the Dispute Before This Court by Citing the Wrong Legal Standard. ........................................................ 35

2.  Defendants Offer No Evidence to Meet the Applicable Standard, Rendering Their Motion Facially Deficient. ......................................... 37

3.  MCI's Search Efforts Have Been More than Adequate, and Defendants' Request for Yet More Discovery on Discovery Should Be Denied. ........... 41

C.  DEFENDANTS' REQUEST CONSTITUTES HARASSMENT AND AN ABUSE OF THE DISCOVERY PROCESS. ...................................................................... 44

V.  THE RICOS' CONCLUSION ................................................................... 45

VI.  MARVEL'S CONCLUSION ................................................................... 45

## I.   **THE RICOS' INTRODUCTION**

Defendants Michele Hart-Rico and Buz Donato F. Rico III (the "Ricos"), the surviving spouse and son, respectively of Donato Francisco Rico II ("Don Rico") request an order compelling Plaintiff Marvel Character's Inc. ("Marvel" or "MCI") to produce documents it has failed to produce which are directly relevant to the parties' claims and defenses and to Marvel's own allegations and theory of the case.

By way of background, Don Rico was a renowned comic book creator best known for co-creating the heroine "Black Widow" on a freelance basis in 1964, featured in two original comic book stories entitled "The Crimson Dynamo Strikes Again!" and "The Black Widow Strikes Again!" (the "Works"), that Marvel published and on which Stan Lee ("Lee") received credit as a purported co-creator. Declaration of Marc Toberoff ("Toberoff Decl.") Ex. 2 (Dkt. 22) ("Counterclaim") ¶ 1; *id*. Ex. 7. The Ricos, as the author's statutory heirs, properly exercised his "termination rights" under the United States Copyright Act, 17 U.S.C. §304(c), to recover his U.S. copyright interest in the Works by statutorily terminating his copyright transfers to Marvel in 1963 when the Works were purchased and 1964 when they were first published (the "Creation Period"). Counterclaim ¶ 2, Ex. A. The termination right is arguably *the* most important authorial right in the Act, after copyright itself, as it enables authors and surviving family to finally participate to some degree in the value of an author's creations once it is no longer conjectural. *Mills Music, Inc. v. Snyder*, 469 U.S. 153, 173 (1985), citing H. R. Rep. No. 94-1476, at 124 (1976).

The sole statutory exemption from termination is "work made for hire." 17 U.S.C. §304(c). Thus Marvel, like most terminated grantees, asserted in hindsight that all the Works were "works made for hire." Toberoff Decl. Ex. 1 (Dkt. 1) ("Complaint") ¶¶ 23-24. Marvel, as the party asserting this statutory exception defense, bears the sole burden of proving its claims which necessitate

a fact-intensive analysis requiring the Court to review Don Rico's particular working relationship and the true circumstances of each Work's creation. *Woods v. Bourne Co.*, 60 F.3d 978, 993 (2d Cir. 1995); *Siegel v. Warner Bros. Entm't, Inc.*, 658 F. Supp. 2d 1036, 1058-60 (C.D. Cal. 2009).

Marvel has initiated four other actions which concern statutory terminations under 17 U.S.C. §304(c) of grants to Marvel of works by four different creators, which actions are currently pending in the Second Circuit: three in the Southern District of New York[1] and one in the Eastern District of New York[2]. Notwithstanding that a fact-centric analysis of a creator's relationship with the publisher and the circumstances of creation of each work is required, Marvel asserted its blanket work-for-hire defense by rote in all cases.

The Ricos propounded requests for production ("RFPs") in February 2022 seeking to discover the actual circumstances of the Works' creation. The Ricos naturally sought to test Marvel's revisionist theory that Don Rico created his Works as "works made for hire," even though in 1963, when they were created, "work for hire" solely applied to traditional employment—not to freelancers like Don Rico. *Estate of Hogarth v. Edgar Rice Burroughs, Inc.*, 342 F.3d 149, 161 n.15 (2d Cir. 2003). Marvel's convenient theory is further suspect given that in the early 1960s, Marvel's comic book business consisted of one alleged employee, Lee plus a bunch of shell companies in whose names the copyrights to published works were routinely registered without any real nexus to the Works or their creation.[3] *See* Counterclaim ¶ 28. It was *not* the Marvel of today.

---

[1] *Marvel Characters, Inc. v. Lieber*, No. 1:21-cv-07955-LAK; *Marvel Characters, Inc. v. Ditko*, No. 1:21-cv-07957-LAK; *Marvel Characters, Inc. v. Dettwiler*, No. 1:21-cv-07959-LAK.

[2] *Marvel Characters, Inc. v. Solo*, No. 1:21-cv-5316-DG-TAM.

[3] For instance, on January 10, 1964 and February 11, 1964, respectively, the Works in question were registered with the U.S. Copyright Office by "Vista

As detailed below, the Ricos' RFPs sought, among other things, agreements, correspondence, and employment and payment records of Marvel's predecessor(s) regarding Don Rico, Lee and/or the Works from 1962 to 1967 (the "Focus Period"). But, while agreeing to produce all non-privileged documents in these critical categories, Marvel produced almost none before 1975 (twelve years after the Works were created) and only twelve documents *total* concerning Don Rico, none of which involve the Works' creation.

Part of the problem may be (i) that Marvel believes its search efforts in 2010 during the *Kirby* litigation[4] (which involved a different creator and different works) satisfies its search obligations in this case today, when it obviously does not, (ii) that Marvel often conducted only electronic searches, *not physical searches*, (iii) that poor quality old scans are not readily searchable electronically, (iv) that electronic searches are only as good as the universe of documents stored in electronic form and (v) that Marvel conducted only limited electronic searches using only " Don Rico" as the search term, failing to include other obvious search terms such as, for example, the creator's many pen names, the name of the Works, or the character *Black Widow*. *See* Ex. 5, RFP No. 30.

Each of the categories of documents described below are of the type that would naturally be within the possession or control of Marvel. Indeed, on July 27, 2022 in the *Lieber*, *Ditko*, and *Dettwiler* cases pending in the Southern District of New York, the court ordered Marvel to produce documents in the same categories described below as to the respective creators in those three cases. Toberoff Decl. Ex. 26. This Court should similarly order Marvel to produce documents concerning Don Rico and/or the Works here.

---

Publications, Inc.," which had no actual employees. Counterclaim ¶¶ 28, 30, Ex. A at 2.

[4] *Marvel Worldwide, Inc. v. Kirby*, No. 1:10-cv-00141-CM-KNF (S.D.N.Y.).

## II. MARVEL'S INTRODUCTION

Defendants' motion rests on equal parts conjecture and misrepresentation, and should be summarily denied. Notwithstanding that Defendants' lawyer-driven copyright termination dispute relates to two comic books published *six decades ago* to which Don Rico contributed, MCI has managed to produce thousands of documents spanning tens of thousands of pages, after extensive efforts to track down and review historical documents from MCI, its predecessors-in-interest, and other entities under the Marvel umbrella, third parties, and public sources. MCI has gone well beyond what is required by the Federal Rules—indeed, it has every incentive to do so here where the evidence shows that Defendants' purported copyright termination notices are invalid because Don Rico provided his services on a work-made-for-hire basis.[5] The Second Circuit has already reached the same conclusion, rejecting substantially similar claims by the estate of Jack Kirby (represented by Defendants' counsel), who contributed to Marvel during essentially the same time period at issue here (the 1960s and 1970s). *See Kirby*, 726 F.3d at 143.[6] Although the significant evidentiary record in *Kirby* is enough to decide this case in MCI's favor, MCI has gone well beyond that record to identify further relevant electronic and hard copy documents concerning Defendants' claim.

Yet Defendants remain unsatisfied—choosing to assume, with no basis in fact, that MCI must be hiding some secret trove of documents from more than

---

[5] The Copyright Act's termination provisions do not apply to works made for hire, *see* 17 U.S.C. § 304(c), which, in the context of older works like those here, means works created at another's "instance and expense." *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 137-40 (2d Cir. 2013). While MCI disagrees that it bears the burden to show Don Rico's work was done at Marvel's "instance and expense," as Defendants claim, MCI searched extensively for such information.
[6] *See also In re Marvel Entertainment Grp.*, 254 B.R. 817 (D. Del. 2000) (holding that Marv Wolfman—another Marvel contributor who worked for Marvel in the same era—provided his services on a work-made-for-hire basis).

- 4 -

half a century ago. Defendants somehow expect MCI to possess comprehensive records dating back to its earliest days—long before the advent of electronic records, MCI's corporate existence, or the termination rights at issue here. Obviously it does not. The fact that certain documents Defendants requested were not produced does not mean they were withheld, as Defendants offensively speculate; it means they were not found. Defendants' counsel should know as much—not only based on MCI's representations, but also based on his experience as counsel in *Kirby* a decade ago where it came to light that many of the records he sought (and now again seeks) did not exist even then. Defendants nevertheless bring their speculative grievance to the Court, asking it to compel MCI to produce additional documents without any indication they exist.

Lacking a factual foundation, Defendants resort to mischaracterizations of MCI's searches and its production (and studiously avoid Defendants' own discovery failings, which are addressed in MCI's concurrently served joint stipulation).[7] Defendants suggest, for example, that MCI has failed to search for physical documents and made "limited" electronic searches. That is false. Remarkably, they also accuse MCI of inadequately searching for payment vouchers even though the parties *agreed* in the meet and confer process how such searches would be conducted based on what files MCI has from the relevant time period. The notion that MCI ran only "Don Rico" as an electronic search term is similarly incorrect—MCI's search was broad enough to capture any formulation of his name (and pen names he used).

Furthermore, despite MCI's sweeping collection and production efforts, Defendants suggest that MCI has produced "only twelve documents" concerning Don Rico. Not only is that accusation galling given their own meager production—Defendants have *collectively* produced just 27 documents to date—

---

[7] If Defendants' motion is not denied outright, MCI asks that the Court resolve these cross-motions in tandem during a single conference.

but it is also fundamentally misleading.  MCI and Defendants conferred about MCI's search methodology, and MCI agreed to label select documents within its production as primarily related to a given contributor as a courtesy to Defendants in the discovery process.  But MCI also produced *well over 5,000 documents* without a specific artist label.  These documents paint a detailed picture of how Marvel historically operated, including the manner in which artists were assigned work, how they were instructed and supervised, and how they were compensated.  In fact, the manner in which Marvel operated—with Stan Lee at the helm—was so ubiquitous that it became known as the "Marvel Method."  *Kirby*, 726 F.3d at 126.  These documents are unquestionably relevant to Don Rico and show that he, like his contemporaries, worked at Marvel's instance and expense.  In any event, to put any doubt about the sufficiency of MCI's search diligence to rest, MCI supplemented its interrogatory responses to provide detailed information about the steps taken.  *See* Ex. 31.

There is no basis for an order compelling MCI to do anything different or more than what it has done.  Each of the categories of documents that Defendants seek is one that MCI has agreed to produce where they can be found, diligently searched for responsive material (in accordance with the parties' agreements), made a substantial production that dwarfs Defendants' efforts, and attempted to confer in good faith with Defendants—even after they prematurely filed a motion with no factual predicate.[8]  Had Defendants similarly conferred in good faith rather than hastily submitting this motion, there would have been no need for the Court's involvement.  Defendants' motion should be rejected.

---

[8] As discussed in Section IV.C., *infra*, Defendants' reference to Judge Kaplan's order in the Southern District of New York is another mischaracterization.  That order merely directed that MCI produce what it had already agreed to produce, *i.e.,* documents that "can be found by a reasonably diligent search, subject to any prior and future agreements among the parties concerning the scope of the search(es) that [MCI] would previously or hereafter will undertake."  Ex. 26.

# III. THE RICOS' CONTENTIONS

## A. Statement of the Issues

On February 4, 2022, the Ricos served RFPs carefully crafted to elicit information regarding, *inter alia*, Marvel's work-for-hire defense and the conditions under which Don Rico created the Works in the Creation Period. Toberoff Decl. Ex. 3. On March 10, 2022, Marvel served its responses and objections to the RFPs ("Responses"). Toberoff Decl. Ex. 4. Marvel's Responses unilaterally redefined the Ricos' RFP definitions (*see e.g.*, *Id.* ¶¶ 25-32), severely restricted the timeframe of responsive documents it would produce, and asserted a host of boilerplate, and, at times, absurd objections—all with great effort to limit its need to participate in discovery. *See generally, Id*. For example, Marvel went as far as to object to the Ricos' definition of the term "Agreement" notwithstanding that Marvel's own definition of that term was *exactly the same*. *Compare* Toberoff Decl. Ex. 3 at 3 ("'AGREEMENT' and 'AGREEMENTS' as used herein refer to any contract, whether written or oral, express or implied.") *with id*. Ex. 6 at 3 ("'Agreement' means any contract, whether written or oral, express or implied.").

The Ricos sent numerous, detailed meet-and-confer letters attempting to resolve these and other issues and held meet-and-confer telephone conferences on March 24, April 21, May 11, and May 26, 2022 in a considerable effort to resolve this discovery dispute without judicial intervention. Toberoff Decl. ¶ 11, Exs. 10-11, 14-17, 19, 21-22 (The Ricos' correspondences dated March 16, April 12, April 28, May 9, May 11, May 11-18, May 27, June 8, and June 13, 2022). Marvel eventually agreed to amend its Responses, which it served on May 5, 2022 ("Amended Responses") wherein it finally agreed for the most part to produce documents responsive to the Ricos' RFPs. *Id*. at Ex. 5. The Ricos then patiently waited for Marvel to produce responsive documents.

For its own convenience and over the Ricos' objections, however, Marvel produced documents in one agglomerated mass production, which it unilaterally deemed applicable to each of the five different termination actions, along with some production charts which Marvel claimed would specify which documents pertained to which case. In short, Marvel produced more than *ten thousand* documents, but, by its own admission in its charts, could only associate *twelve* of those ten thousand with Don Rico: two comic books, two copyright registrations, and the notice of termination the Ricos had sent to Marvel (*see* Counterclaim Ex. A), form AO-121 filed in this suit (Dkt. 10), multiple copies of a deposition excerpt from another case which mentions Rico only in passing, an interview with Larry Lieber, an interview with Don Rico from 1977 about his views on art and comics, and a half-page story about his life and work after his death. *See* XREF_2021MARVEL-PROD001-003; XREF_2021MARVEL-PROD006.[9]

Notwithstanding Marvel's hefty, agglomerated document dump, its production omitted nearly all critical categories of documents from 1962-1974, (including the 1963-1964 Creation Period of the Works and 1962-1967 RFP Focus Period) relevant to Marvel's work-for-hire defense, including employment agreements, payment and tax documents, plot outlines, or any evidence that Marvel's predecessor had the alleged "right" to control Don Rico's creation of the Works. Toberoff Decl. Exs. 15, 22. In response to the Ricos' meet-and-confer letters addressing this problem in detail, Marvel repeatedly dodged the issue. Toberoff Decl. Exs. 12-13, 17-18, 20, 23 (Marvel's correspondences dated April 19, April 25, May 11-18, May 24, June 1, and June 15, 2022). Marvel's reply letters contained what became its customary deflection

---

[9] The production charts are lengthy Excel spreadsheets which do not reformat well in PDF. Accordingly, the Ricos have not attached these charts as exhibits, but will make them available should the Court wish.

tactic, the recipe for which is: (1) repeated references to *the number* of pages Marvel produced as alleged evidence of its exemplary performance (irrespective of relevance and that only twelve related to Don Rico or the Works); and (2) lengthy narratives which mischaracterize and misstate facts and feign outrage in a bid to falsely portray *the Ricos* as exhausting, habitual delinquents in discovery. Toberoff Decl. Exs. 24-25.

Marvel's deflections, mischaracterizations, and theatrics are all performed to distract and misdirect the Court's attention away from Marvel's grossly deficient production in key areas during the Creation Period and Focus Period. Marvel has dumped thousands of irrelevant or, at best, marginally relevant documents on the Ricos while withholding those that are most critical to these cases and a proper "work for hire" analysis by the Court. The documents requested dating from the 1960s, which is not so long ago, are most certainly in the possession or control of Marvel—a sophisticated, multi-billion-dollar operation—or its parent, subsidiaries, or affiliates. The age of the documents provides Marvel no excuse for its production failures, particularly since Marvel has been sued repeatedly on character rights issues commencing in 1966—just three years after the Works were created. *See Simon*, 310 F.3d at 283. Thus, Marvel has long known the importance of document retention concerning the authorship of Works it publishes, particularly those, as here, featuring its most famous superheroes.

The parties have reached an impasse on these discovery issues and as such, the Ricos are forced to seek an Order of this Court compelling Marvel's production of responsive documents in the relevant categories discussed below. The Ricos are further requesting that Marvel be ordered to provide a declaration of due diligence detailing its efforts to search both its electronic and physical files, the location of the searched files, the search terms it employed and the results of those searches.

## B.    Legal Standard

Federal Rule of Civil Procedure 34(a) permits courts to order production of documents that are in the possession, custody, or control of the responding party. *See Burke v. Basil*, 2021 U.S. Dist. LEXIS 147270, at *5 (C.D. Cal. May 28, 2021). "The term 'control' is broadly construed, and it includes documents that the responding party has the legal right to obtain from third parties." *SEC v. Premier Holding Corp.*, 2021 U.S. Dist. LEXIS 246096, at *13 (C.D. Cal. Sep. 7, 2021) (Magistrate Scott), quoting *Bryant v. Armstrong*, 285 F.R.D. 596, 603 (S.D. Cal. 2012). Moreover, "[i]t is well-established that the burden is on the objecting party to show grounds for failing to provide the requested discovery." *Premier Holding Corp.*, 2021 U.S. Dist. LEXIS 246096, at *7 (internal citations and quotations omitted); *Full Tilt Boogie v. Fortune*, 2021 U.S. Dist. LEXIS 194652, at *11 (C.D. Cal. June 9, 2021) (Magistrate Scott).

When a party's failure to produce documents is not plausible, a court can order that party to provide a sworn declaration detailing its search efforts and due diligence in affirming its alleged lack of responsive documents. *Premier Holding Corp.*, 2021 U.S. Dist. LEXIS 246096, at *12-13 ("At the hearing, Letcavage's counsel indicated that Letcavage has no documents in his possession, custody, or control which are responsive to Requests 7-8 and 10-24. The Court finds this assertion not plausible . . . In supplementing his responses, if Letcavage still contends he has no documents in his possession, custody, or control responsive to a Request, he shall execute a due diligence declaration describing where and how he looked for responsive documents and affirming that he either has or will produce all nonprivileged, responsive documents.").

## C.    Marvel's "Instance and Expense" Defense

Marvel's entire case rests on its alleged defense that the work performed by Don Rico was done at Marvel's "instance and expense" rendering the Works as "work made for hire." Complaint ¶ 1.

- 10 -

Marvel has alleged that whether a Work was "made for hire" turns on whether it was created at the "instance and expense" of Marvel's predecessor that registered the copyright to the Work. *See e.g.*, Complaint ¶¶ 1, 13, 24-25. According to Marvel, the Works were created at its "instance" because its editor had the alleged legal right to control Don Rico's creation of the Works (*Id.* ¶¶ 14, 25) and at its "expense" because its predecessor paid Don Rico for his services in creating the Works (*Id.* ¶¶ 14, 26).

It is well accepted that whether a work is "made for hire" turns on the mutual "intent of the parties." *Playboy Enters. v. Dumas*, 53 F.3d 549, 556-57 (2d Cir. 1995). In all instances, including the copyright termination context, the work-for-hire analysis is fact-intensive, requiring the Court to review Don Rico's particular working relationship and the true circumstances of each Work's creation. *See Siegel v. Warner Bros. Entm't, Inc.*, 658 F. Supp. 2d 1036, 1058-60 (C.D. Cal. 2009); *Urbont v. Sony Music Entm't*, 831 F.3d 80, 90 (2d Cir. 2016) ("turns on the parties' creative and financial arrangement as revealed by the record in each case.") (internal quotation marks omitted); *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 291 (2d Cir. 2002) (same). The analysis requires an evaluation of "the actual relationship between the parties, rather than the language of their agreements, in determining authorship of the work." *Simon*, 310 F.3d at 291, citing *Donaldson Pub. Co. v. Bregman, Vocco & Conn, Inc.*, 375 F.2d 639, 640-42 (2d Cir. 1967); *see also* 3 Nimmer on Copyright §11.02[A][2] (2022) ("[I]t is the relationship that in fact exists between the parties … that is determinative.").

Marvel carries the burden to demonstrate that the Works were indeed made at its instance and at its expense both because Marvel is the party asserting the work-for-hire defense, and because it constitutes a statutory exemption to the Copyright Act's termination provisions. *Self-Realization Fellowship Church v. Ananda Church of Self-Realization*, 206 F.3d 1322, 1326 (9th Cir. 2000) ("*Self-*

- 11 -

*Realization*") (the party claiming the work-for-hire defense must present "credible evidence that [the artist's] work was done at the 'instance and expense' of" the hiring party), quoting *Dolman v. Agee*, 157 F.3d 708, 712 (9th Cir. 1998); *Woods*, 60 F.3d at 993-94 (discussing work-for-hire exception to the termination right: the "party claiming [this] exception," must "bear the burden of proof" on it.); *see also FTC v. Morton Salt Co.*, 334 U.S. 37, 44-45 (1948) (noting the "general rule of statutory construction" that "the burden of proving justification or exemption under a special exception to . . . a statute generally rests on one who claims its benefits"). To carry its burden, Marvel must produce documents relevant to its work-for-hire defense but has utterly failed to do so.

### D. The Issues in Dispute

#### 1. *Marvel Must Produce Agreements with Don Rico in the Focus Period.*

As part of the expense prong of Marvel's "instance and expense" defense, it alleged that Don Rico created the Works with the "expectation that Marvel would pay him." Complaint ¶ 4. Accordingly, the Ricos propounded RFP Nos. 1, 2, 4, and 18 which naturally sought documents concerning negotiations and Agreements which gave Don Rico this alleged "expectation" of payment and with respect to the "instance" prong to determine the nature and scope of Don Rico's actual relationship with Marvel. *Siegel*, 496 F. Supp. 2d at 1139 (The instance prong of the test looks at "the nature and scope of the parties' business relationship."). Such documents would not only include Agreements[10] themselves but would also include any communications reflecting the terms of any Agreements or the negotiations thereof. The RFPs and Amended Responses regarding this category of requested documents are as follows:

---

[10] Toberoff Decl. Ex. 3 at 3 ("'AGREEMENT' and 'AGREEMENTS' as used herein refer to any contract, whether written or oral, express or implied.").

**REQUEST FOR PRODUCTION NO. 1:**

All DOCUMENTS[11] that state, memorialize or reflect any AGREEMENT between RICO[12] and MARVEL[13].

**RESPONSE TO REQUEST FOR PRODUCTION NO. 1:**

MCI objects to this Request on the grounds that it is overbroad, unduly burdensome, and—insofar as it calls for the production of "any" agreement—seeks documents that are not relevant to any issue in this action and are not reasonably calculated to lead to the discovery of admissible evidence. MCI further objects to this Request on the grounds that "reflect[ing]" an agreement is vague and ambiguous, and MCI interprets "reflect" as having the same meaning as "state" and "memorialize" as to this Request. Further responding, MCI objects to this Request on the grounds that it calls for the production of privileged documents or documents protected by the attorney work-product privilege. Based on the parties' meet-and-confer discussions, MCI understands that Agreements are distinct from payment(s), which were separately requested and discussed by the parties. Subject to and without waiving these specific objections and the General Objections, with the exception of vouchers that are stored in hard-copy or not otherwise scanned and searchable by contributor, MCI will produce non-privileged documents in its possession, custody, or control that state, memorialize, or reflect any Agreement between Don Rico and Marvel relating to work performed by Don Rico, if any, that are

---

[11] Toberoff Decl. Ex. 3 at 2-3 ("DOCUMENTS" is to be interpreted broadly and includes all forms of writings, data, tangible things, and other documents contemplated by Federal Rule of Civil Procedure 34 or Federal Rule of Evidence 1001. The term "DOCUMENTS" includes both hard-copy DOCUMENTS as well as electronically stored data-files (citing examples).).

[12] Toberoff Decl. Ex. 3 at 1 ("RICO" as used herein, refers to Donato Francisco Rico II also known as Don Rico.).

[13] Toberoff Decl. Ex. 3 at 1 ("MARVEL" as used herein, refers to Plaintiff and Counterclaim-Defendant Marvel Characters, Inc., and any past or present predecessors-in-interest or successors-in-interest, and any other PERSON or PERSONS acting on their behalf, including, but not limited to, past or present agents, managers, representatives, advisors, employees, attorneys, accountants, investigators and insurance companies, both singularly and cumulatively.).

identified through a reasonably diligent inquiry and not otherwise subject to a protective order or confidentiality requirement.

Toberoff Decl. Ex. 5 at 16-17.

**REQUEST FOR PRODUCTION NO. 2:**
All DOCUMENTS that memorialize or reflect any negotiations of any AGREEMENT between RICO and MARVEL.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 2:**
MCI objects to this Request on the grounds that it is overbroad, unduly burdensome, and—insofar as it calls for the production of "all" documents pertaining to "any" negotiations and/or drafts of "any" agreement—seeks documents that are not relevant to any issue in this action and are not reasonably calculated to lead to the discovery of admissible evidence. MCI further objects to this Request on the grounds that "reflect[ing]" a negotiation and/or draft is vague and ambiguous, and MCI interprets "reflect" as having the same meaning as "memorialize" as to this Request. Further responding, MCI objects to this Request on the grounds that it calls for the production of privileged documents or documents protected by the attorney work-product privilege. Based on the parties' meet-and-confer discussions, MCI understands that Agreements are distinct from payment(s), which were separately requested and discussed by the parties. Subject to and without waiving these specific objections and the General Objections, with the exception of vouchers that are stored in hard-copy or not otherwise scanned and searchable by contributor, MCI will produce non-privileged documents in its possession, custody, or control that memorialize or reflect any negotiations and/or drafts of Agreements between Don Rico and Marvel relating to work performed by Don Rico, if any, that are identified through a reasonably diligent inquiry and not otherwise subject to a protective order or confidentiality requirement.

Toberoff Decl. Ex. 5 at 17.

**REQUEST FOR PRODUCTION NO. 4:**
All drafts of any AGREEMENT between RICO and MARVEL.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 4:**
MCI objects to this Request on the grounds that it is overbroad, unduly burdensome, and—insofar as it calls for the production of

"all" drafts of "any" agreement—seeks documents that are not relevant to any issue in this action and are not reasonably calculated to lead to the discovery of admissible evidence. Further responding, MCI objects to this Request on the grounds that it calls for the production of privileged documents or documents protected by the attorney work-product privilege. Based on the parties' meet-and-confer discussions, MCI understands that Agreements are distinct from payment(s), which were separately requested and discussed by the parties. Subject to and without waiving these specific objections and the General Objections, with the exception of vouchers that are stored in hard-copy or not otherwise scanned and searchable by contributor, MCI will produce non-privileged drafts of Agreements between Don Rico and Marvel relating to work performed by Don Rico in MCI's possession, custody, or control, if any, that are identified through a reasonably diligent inquiry and not otherwise subject to a protective order or confidentiality requirement.

Toberoff Decl. Ex. 5 at 18.

### REQUEST FOR PRODUCTION NO. 18:
DOCUMENTS that state, memorialize or reflect any AGREEMENT between MARVEL and any of the RICO DEFENDANTS[14].

### RESPONSE TO REQUEST FOR PRODUCTION NO. 18:
MCI objects to this Request on the grounds that it is overbroad, unduly burdensome, and—insofar as it calls for the production of "any" agreement—seeks documents that are not relevant to any issue in this action and are not reasonably calculated to lead to the discovery of admissible evidence. MCI further objects to this Request on the grounds that "reflect[ing]" an agreement is vague and ambiguous, and MCI interprets "reflect" as having the same meaning as "state" and "memorialize" as to this Request. Further responding, MCI objects to this Request on the grounds that it calls for the production of privileged documents or documents protected by the attorney work-product privilege. Based on the parties' meet-and-confer discussions, MCI understands that Agreements are distinct from payment(s), which were separately requested and discussed by the parties. Subject to and without waiving these

---

[14] Toberoff Decl. Ex. 3 at 1 ("RICO DEFENDANTS" as used herein, refers to Defendants and Counterclaim-Plaintiffs Michele Hart-Rico and Buz Donato F. Rico III.).

- 15 -

specific and the General Objections, MCI will produce non-privileged documents in its possession, custody, or control that state, memorialize, or reflect any Agreement between Marvel and any of the Rico Defendants relating to work performed by Don Rico during the years 1960 to 1965, if any, that are identified through a reasonably diligent inquiry and not otherwise subject to a protective order or confidentiality requirement.

Toberoff Decl. Ex. 5 at 27.

Notwithstanding Marvel's lengthy, contrived objections and obstructive carve-outs, Marvel ultimately agreed to produce responsive documents but has completely failed to do so. Marvel did not produce documents concerning negotiations, nor any Agreements with Don Rico in the Focus Period. The documents requested are unquestionably relevant as they would help determine the true circumstances under which Don Rico sold his Works to Marvel, and shed light on Marvel's purported work-for-hire defense. The Ricos repeatedly requested the production of such documents in their meet-and-confer sessions and letters but such requests have gone unanswered. Toberoff Decl. Exs. 15, 22.

> **2.** *Marvel Must Produce Documents Concerning Payments to and the Tax Treatment of Don Rico and Lee in the Focus Period.*

Relevant to the "expense" prong of the "instance and expense" test, the Ricos' RFPs requested documents evidencing payments made to Don Rico and to Lee for the Works and Marvel's contemporaneous tax treatment of those payments in the Creation Period. Complaint ¶¶ 25-26; *Twentieth Century Fox Film Corp. v. Entm't Distrib.*, 429 F.3d 869, 881 (9th Cir. 2005) ("*Twentieth Century*") (A work is created at a party's "expense" if that party takes on "all the financial risk" of the work's creation.).

The Ricos RPFs on this issue read as follows:

## REQUEST FOR PRODUCTION NO. 9:

All DOCUMENTS reflecting any payment(s) by VISTA[15] to RICO for the RICO MATERIAL[16].

## RESPONSE TO REQUEST FOR PRODUCTION NO. 9:

Subject to and without waiving the General Objections, with the exception of offsite, hard-copy financial documents from 1980s and 1990s discussed between the parties, MCI will produce non-privileged documents in its possession, custody, or control that are responsive to this Request, if any, that are identified through a reasonably diligent inquiry of electronic searches identified with Don Rico's name and not otherwise subject to a protective order or confidentiality requirement.

Toberoff Decl. Ex. 5 at 21-22.

## REQUEST FOR PRODUCTION NO. 10:

All DOCUMENTS reflecting any payment(s) by VISTA to STAN LEE[17] in connection with the WORKS.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 10:

MCI objects to the definition of "STAN LEE" as overbroad and burdensome insofar as it includes "any and all present or former agents, employees, representatives, attorneys, accountants, investigators, or any other person, acting or purporting to act on Stan Lee's behalf." MCI interprets "Stan Lee" to mean Stan Lee himself. Subject to and without waiving this specific objection and the General Objections, with the exception of offsite, hard-copy financial documents from 1980s and 1990s discussed between the

---

[15] Toberoff Decl. Ex. 3 at 2 ("VISTA" as used herein, refers to Vista Publications, Inc.).

[16] Toberoff Decl. Ex. 3 at 1 ("RICO MATERIAL" as used herein, refers to RICO's written contributions to the comic book stories entitled "The Crimson Dynamo Strikes Again!" and "The Black Widow Strikes Again!" that were published in Tales of Suspense Vol. 1, Nos. 52 and 53, respectively.).

[17] Toberoff Decl. Ex. 3 at 2 ("STAN LEE" as used herein, refers to Stan Lee and any and all present or former agents, employees, representatives, attorneys, accountants, investigators, or any other PERSON, acting or purporting to act on Stan Lee's behalf.).

parties, MCI will produce non-privileged documents in its possession, custody, or control that are responsive to this Request, if any, that are identified through a reasonably diligent inquiry of electronic searches identified with Stan Lee's name and not otherwise subject to a protective order or confidentiality requirement.

Toberoff Decl. Ex. 5 at 22.

**REQUEST FOR PRODUCTION NO. 11:**
All DOCUMENTS reflecting any payment(s) by VISTA to STAN LEE in 1963-1964.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 11:**
MCI objects to this Request on the grounds that it is overbroad, unduly burdensome, and seeks documents that are not relevant to any issue in this action and are not reasonably calculated to lead to the discovery of admissible evidence. MCI further objects to the definition of "STAN LEE" as overbroad and burdensome insofar as it includes "any and all present or former agents, employees, representatives, attorneys, accountants, investigators, or any other person, acting or purporting to act on Stan Lee's behalf." MCI interprets "Stan Lee" to mean Stan Lee himself. Subject to and without waiving these specific objections and the General Objections, MCI will produce non-privileged documents in its possession, custody, or control concerning payments by Vista to Stan Lee in 1963 and 1964, if any, that are identified through a reasonably diligent inquiry of electronic searches identified with Stan Lee's name and not otherwise subject to a protective order or confidentiality requirement.

Toberoff Decl. Ex. 5 at 22-23.

**REQUEST FOR PRODUCTION NO. 29:**
All DOCUMENTS that evidence any payment(s) to RICO by MARVEL including copies of all checks (front and back), bank records, pay stubs or accounting records, including but not limited to, in the years 1963-1964.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 29:**
MCI objects to this Request on the grounds that it is overbroad, unduly burdensome, and seeks documents that are not relevant to any issue in this action and are not reasonably calculated to lead to

- 18 -

the discovery of admissible evidence. Subject to and without waiving these specific objections and the General Objections, with the exception of offsite, hard-copy financial documents from 1980s and 1990s discussed between the parties, MCI will produce non-privileged documents in its possession, custody, or control that are responsive to this Request, if any, that are identified through a reasonably diligent inquiry of electronic searches identified with Don Rico's name and not otherwise subject to a protective order or confidentiality requirement.

Toberoff Decl. Ex. 5 at 34.

**REQUEST FOR PRODUCTION NO. 30:**
DOCUMENTS that evidence MARVEL's tax treatment of any compensation paid by MARVEL to RICO in the years 1962-1967.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 30:**
Subject to and without waiving the General Objections, MCI will produce non-privileged documents in its possession, custody, or control that are responsive to this Request, if any, that are identified through a reasonably diligent inquiry of electronic searches identified with Don Rico's name and not otherwise subject to a protective order or confidentiality requirement.

Toberoff Decl. Ex. 5 at 34-35.

**REQUEST FOR PRODUCTION NO. 31:**
All DOCUMENTS that evidence payments to STAN LEE by MARVEL including, copies of all checks (front and back), bank records, pay stubs or accounting records in the 1960s, including but not limited to in the years 1963-1964.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 31:**
MCI objects to this Request on the grounds that it is overbroad, unduly burdensome, and seeks documents that are not relevant to any issue in this action and are not reasonably calculated to lead to the discovery of admissible evidence. MCI further objects to the definition of "STAN LEE" as overbroad and burdensome insofar as it includes "any and all present or former agents, employees, representatives, attorneys, accountants, investigators, or any other person, acting or purporting to act on Stan Lee's behalf." MCI interprets "Stan Lee" to mean Stan Lee himself. Subject to and without waiving these specific objections and the General

Objections, MCI will produce non-privileged documents in its possession, custody, or control that evidence payments to Stan Lee in the 1960s , if any, that are identified through a reasonably diligent inquiry and not otherwise subject to a protective order or confidentiality requirement.

Toberoff Decl. Ex. 5 at 35.

**REQUEST FOR PRODUCTION NO. 32:**
DOCUMENTS that evidence MARVEL's tax treatment of the compensation paid by MARVEL to STAN LEE in the 1960s, including but not limited to in the years 1963-1964.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 32:**
MCI objects to this Request on the grounds that it is overbroad, unduly burdensome, and seeks documents that are not relevant to any issue in this action and are not reasonably calculated to lead to the discovery of admissible evidence. MCI objects to the definition of "STAN LEE" as overbroad and burdensome insofar as it includes "any and all present or former agents, employees, representatives, attorneys, accountants, investigators, or any other person, acting or purporting to act on Stan Lee's behalf." MCI interprets "Stan Lee" to mean Stan Lee himself. Subject to and without waiving these specific objections and the General Objections, MCI will produce non-privileged documents in its possession, custody, or control that evidence Marvel's tax treatment of payments to Stan Lee in the 1960s, if any, that are identified through a reasonably diligent inquiry and not otherwise subject to a protective order or confidentiality requirement.

Toberoff Decl. Ex. 5 at 35-36.

**REQUEST FOR PRODUCTION NO. 47:**
All DOCUMENTS that support YOUR[18] allegation in Paragraph 14 of the COMPLAINT that "Marvel paid Don Rico a per-page rate for his contributions."

---

[18] Toberoff Decl. Ex. 3 at 3 ("YOU" and "YOUR" mean, collectively and severally, MARVEL and any and all predecessor or successor entities, any and all divisions thereof, and any and all present and former officers, directors, representatives, shareholders, agents, employees, attorneys, accountants, investigators, or any other PERSON, or affiliate acting or purporting to act on any of MARVEL's behalf.).

**RESPONSE TO REQUEST FOR PRODUCTION NO. 47:**

MCI objects to the Request on the grounds that it is overbroad, unduly burdensome and calls for the production of documents protected by the attorney work-product privilege. MCI further states that it has not yet determined which documents on which it intends to rely to prove all the allegations in the complaint. Subject to and without waiving these specific objections and the General Objections, MCI will produce non-privileged documents in its possession, custody, or control that are responsive to this Request, if any, that are identified through a reasonably diligent inquiry and not otherwise subject to a protective order or confidentiality requirement.

Toberoff Decl. Ex. 5 at 44.

Marvel, however, again produced almost no payment documents dated before 1975 (aside from Don Heck's ledger, which was produced by the defendant in the *Dettwiler* case) and, specifically, failed to produce any evidence that its predecessor-in-interest, Vista, paid Don Rico or Lee for the Works. This omission is critical, given that Marvel's entire work-for-hire defense is based on Vista's alleged payments to Don Rico for the Works.

As noted above, part of the problems appears to be Marvel's refusal to make a thorough physical search for documents. For example, Marvel agreed to produce only those documents which it could search for and discover electronically. *See* Toberoff Decl. Ex. 5 at 22-23 (RFP Nos. 10-11), 34-35 (RFP Nos. 29-30); *see also id.* Ex. 12 at 3 (Marvel: "MCI will agree to produce responsive payment documents to the Defendant Contributors to the extent that it can identify such records through electronic searches identified with the Defendant Contributors' names."); *id.* Ex. 14 at 1 (Ricos: "Marvel assured Defendants that its amended responses . . . would make clear that *Marvel would make a physical, as well as electronic*, search for checks and/or other payment documents from the relevant time period, but would not, as the parties have agreed, search boxes containing payment document solely dated from the 1980s,

1990s, or later.") (emphasis added). Marvel's failure to make a physical search and only narrow electronic searches are problematic for several reasons.

*First*, the Federal Rules do not permit a party to limit its discovery efforts to those documents for which it can conveniently electronically search. *See e.g., Waite v. UMG Recordings, Inc.*, 2020 U.S. Dist. LEXIS 125059, at *6-7 (S.D.N.Y. July 13, 2020) (regarding copyrights terminations as to songs: "The Court is mindful of the undertaking required to review the contents of over 2,000 boxes of materials, boxes that may or may not contain relevant information. However, this burden must be weighed against plaintiffs' right to discovery that is relevant to its claim and proportional to the needs of the case . . . defendant must produce all documents and other requested discovery, *whether digitally stored or contained within the storage boxes*, relevant to its position that the 25 recording artists' works were 'made for hire.'") (emphasis added).

*Second*, the payment records and tax documents in questions are from the 1960s and as such, it is highly unlikely that these documents would be available electronically on Marvel's databases. Indeed, Marvel has admitted that it has financial records stored in hard-copy in off-site storage, which it has declined to search because it blankly claims that no vouchers there precede 1987, ignoring the many other types of documents that may be relevant to the issues herein. Toberoff Decl. Ex. 5 at 22 (RFP No. 10), 34 (RFP No. 29); *id*. Ex. 12 at 2 (Marvel: "As to vouchers, MCI confirms that it does not have any vouchers prior to 1987, which should moot Defendants' concerns. MCI, however, will nevertheless also agree to produce any vouchers that it identifies through electronic searches associated with the Defendant Contributors' names, but will not agree to undertake the burden to search for other vouchers.").

*Third*, sixty-year-old documents do not scan well and are often unresponsive to text-searches. Thus, even in the off chance that Marvel had scanned electronic copies of relevant documents from the 1960s, it is unlikely

that those documents would be found through keyword searches, particularly the inherently limited searches allegedly conducted by Marvel.

*Fourth*, Marvel has limited its search for payment and tax documents concerning the Works in question to electronically stored documents which present themselves based solely on the keyword search "Don Rico." *See* Toberoff Decl. Ex. 5 at 34-35 (RFP Nos. 29-30). This is insufficient particularly since Don Rico's full name is Donato Francisco Rico II and formal payment/tax documents are unlikely to use his shortened name. In addition, Don Rico worked for many years under various pen names including "Dan Rico," "Donella St. Michaels," "Donna Richards," "Joseph Milton," and "N. Korok" which is, as Marvel knows, the nom de plume Don Rico used in connection with the Works. *Id*. Ex. 7.

To make matters worse, we know that Marvel's payment system from the late 1970s until present was organized by tracking the payments made to the creators and associating those payments with the works those creators had submitted. *See e.g.*, *Id*. Ex. 8. As such, it is troubling that Marvel did not even bother to search using other obvious keywords such as "Vista", the names of the Works, or the characters featured in the Works (e.g., Black Widow, Madame Natasha, Iron Man, Happy Hogan, Golden Avenger, Anton Vanko, Tony Stark). By unilaterally limiting its searches to "Don Rico" only, Marvel is likely to have missed many documents associated with Don Rico and the Works.

### 3. *Marvel Must Produce Documents Evidencing Its Alleged Legal Right to Control Don Rico's Creation of the Works.*

The "instance" prong of Marvel's work-for-hire defense is based in part on Marvel's alleged legal *right* to control Don Rico's *creation* of the Works, notwithstanding that Don Rico worked from home and used his own materials. Complaint ¶ 25; *Siegel*, 496 F. Supp. 2d at1139 ("[T]he 'instance' requirement is also 'shaped in part by the degree to which the hiring party had the right to

control or supervise the artist's work,' a circumstance reflective of the work being created within the confines of an employment relationship."), quoting *Twentieth Century*, 429 F.3d at 879. As such, the Ricos propounded RFP Nos. 6 and 46 to obtain documents relating to Marvel's purported legal right to exercise control over Don Rico, as follows:

> **REQUEST FOR PRODUCTION NO. 6:**
> All DOCUMENTS that evidence or reflect MARVEL's alleged right to exercise control over RICO's creation of the RICO MATERIAL.
>
> **RESPONSE TO REQUEST FOR PRODUCTION NO. 6:**
> Subject to and without waiving the General Objections, MCI will produce non-privileged documents in its possession, custody, or control that evidence or reflect its right to exercise control over Don Rico's contributions to the Rico Material, if any, that are identified through a reasonably diligent inquiry and not otherwise subject to a protective order or confidentiality requirement.

Toberoff Decl. Ex. 5 at 19.

> **REQUEST FOR PRODUCTION NO. 46:**
> All DOCUMENTS that support YOUR allegation in Paragraph 14 of the COMPLAINT[19] that "Marvel editorial staff had the right to exercise creative control over Don Rico's contributions."
>
> **RESPONSE TO REQUEST FOR PRODUCTION NO. 46:**
> MCI objects to the Request on the grounds that it is overbroad, unduly burdensome and calls for the production of documents protected by the attorney work-product privilege. MCI further states that it has not yet determined which documents on which it intends to rely to prove all the allegations in the complaint. Subject to and without waiving these specific objections and the General Objections, MCI will produce non-privileged documents in its possession, custody, or control that are responsive to this Request, if any, that are identified through a reasonably diligent inquiry and

---

[19] Toberoff Decl. Ex. 3 at 2 ("COMPLAINT" as used herein, refers to Complaint for Declaratory Relief filed in *Marvel Characters, Inc. v. Rico*, No. 2:21-CV-7624-DMG-KES (C.D. Cal.), Dkt. No. 1.).

- 24 -

not otherwise subject to a protective order or confidentiality requirement.

Toberoff Decl. Ex. 5 at 43-44.

The Ricos met and conferred with Marvel numerous times to obtain such responsive documents but Marvel, once again, failed to produce responsive documents concerning the Works or Don Rico in the Creation Period and Focus Period—yet another serious omission. Toberoff Decl. Exs. 15, 22.

### 4. *Marvel Must Produce Relevant Correspondence with Lee Concerning Don Rico.*

Marvel produced no correspondence with or from Lee concerning Don Rico or the Works, despite Lee having worked with Marvel for nearly *80 years*. Moreover, the alleged legal right of Marvel's predecessor to control Don Rico's creation of the Works is predicated on Lee's editorial functions and the communications attendant to those functions. Complaint ¶ 14. Accordingly, the Ricos propounded RFP No. 17 seeking Lee's correspondence concerning Don Rico. That RFP reads as follows:

**REQUEST FOR PRODUCTION NO. 17:**
All COMMUNICATIONS[20], including all e-mails, between YOU and STAN LEE that RELATE or REFER[21] to RICO.

---

[20] Toberoff Decl. Ex. 3 at 3 ("COMMUNICATIONS" means all written, electronic, oral, telephonic, gesture, or other transmission or exchange of information, INCLUDING any inquiry, request, dialogue, discussion, conversation, interview, correspondence, letter, note, consultation, negotiation, agreement, understanding, meeting, e-mail, text message, and all DOCUMENTS evidencing any verbal or nonverbal interaction between any individuals or entities.); *id*. ("INCLUDING" means "including, but not limited to.").

[21] Toberoff Decl. Ex. 3 at 3 ("REFER" or "RELATE" means, without limitation, evidence, regard, concern, discuss, reflect, summarize, constitute, contain, study, assess, analyze, explain, mention, show, embody, discuss, describe, or comment upon—directly or indirectly—the subject matter identified.).

## RESPONSE TO REQUEST FOR PRODUCTION NO. 17:

MCI objects to this Request on the grounds that it is overbroad, unduly burdensome, and seeks documents that are not relevant to any issue in this action and are not reasonably calculated to lead to the discovery of admissible evidence. MCI also objects to this Request on the basis that "REFER" and "RELATE" are vague, ambiguous, overbroad, and unduly burdensome. MCI interprets "REFER" and "RELATE" to carry their reasonable, common-sense meaning. Further responding, MCI objects to this Request on the ground that it seeks documents protected by the attorney-client or common-interest privileges. MCI further objects to the definition of "STAN LEE" as overbroad and burdensome insofar as it includes "any and all present or former agents, employees, representatives, attorneys, accountants, investigators, or any other person, acting or purporting to act on Stan Lee's behalf." MCI interprets "Stan Lee" to mean Stan Lee himself. Subject to these specific objections and the General Objections, MCI states that it will produce any non-privileged documents in its possession, custody, or control that are responsive to this Request and relate to Don Rico's employment relationship with Marvel, ownership of and rights to the works at issue in this action, or contributions made by Don Rico to those works, if any, that are identified through a reasonably diligent inquiry and not otherwise subject to a protective order or confidentiality requirement.

Toberoff Decl. Ex. 5 at 26.

Yet, notwithstanding that Lee worked with Marvel for four-fifths of a century and was a very prolific correspondent, Marvel has produced *no correspondence* from Lee which relate to Don Rico, the Works, or the way Marvel's predecessor actually functioned during the Creation Period or Focus Period. That Marvel has no such documents is simply not plausible. Indeed, we know that such communications exist, because the Ricos were able to produce some correspondence between Don Rico and Lee. *See e.g.*, Toberoff Decl. Ex. 9. It strains credulity to believe that Marvel, nor any entity or person within its control, has no such responsive documents.

### 5. *Marvel Must Produce Documents Evidencing Don Rico and Lee's Working Status.*

Marvel also failed to produce documents which relate to Don Rico's employment by Marvel or freelance status in the Focus Period. Complaint ¶ 25; *Siegel* 496 F. Supp. 2d at 1139 (ruling that the employment relationship that existed between the parties when the work was created is a relevant consideration under the "instance" prong of the test). Accordingly, the Ricos propounded RFP Nos. 7-8 and 25-27 which read as follows:

**REQUEST FOR PRODUCTION NO. 7:**
DOCUMENTS evidencing that STAN LEE was employed by MARVEL in 1963-1965.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 7:**
MCI objects to this Request on the grounds that it is overbroad, unduly burdensome, and seeks documents that are not relevant to any issue in this action and are not reasonably calculated to lead to the discovery of admissible evidence. MCI further objects to the definition of "STAN LEE" as overbroad and burdensome insofar as it includes "any and all present or former agents, employees, representatives, attorneys, accountants, investigators, or any other person, acting or purporting to act on Stan Lee's behalf." MCI interprets "Stan Lee" to mean Stan Lee himself. MCI also objects to this Request on the grounds that "evidenc[ing] that STAN LEE was employed by MARVEL" is vague and ambiguous. Based on the parties' meet-and-confer discussions, MCI understands this Request to be seeking any employment Agreements (or any other Agreements with Lee relating to the future provision of services), hiring records, and letters and/or communications referring to Lee as an employee, freelancer, or independent contractor that are identified through a reasonably diligent search. MCI notes that it does not have any documents reflecting the tax treatment of payments to Stan Lee for the provision of services during the relevant time period, as MCI only has such documents beginning in approximately 1998. MCI will not produce those documents, given that privacy concerns significantly outweigh their probative value, in addition to the other objections MCI has raised with respect to this Request. With this understanding, and subject to these specific

objections and the General Objections, MCI will produce responsive non-privileged documents in its possession, custody, or control, if any, that are identified through a reasonably diligent inquiry and not otherwise subject to a protective order or confidentiality requirement.

Toberoff Decl. Ex. 5 at 19-20.

**REQUEST FOR PRODUCTION NO. 8:**
DOCUMENTS evidencing that STAN LEE was employed by VISTA, including but not limited to, in 1963-1964.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 8:**
MCI objects to this Request on the grounds that it is overbroad, unduly burdensome, and seeks documents that are not relevant to any issue in this action and are not reasonably calculated to lead to the discovery of admissible evidence. Further responding, MCI objects to the Request as imposing a burden grossly disproportionate to the needs of this case insofar as it requires searching for documents from approximately sixty years ago, unconstrained by a specific date range. MCI further objects to the definition of "STAN LEE" as overbroad and burdensome insofar as it includes "any and all present or former agents, employees, representatives, attorneys, accountants, investigators, or any other person, acting or purporting to act on Stan Lee's behalf." MCI interprets "Stan Lee" to mean Stan Lee himself. MCI also objects to this Request on the grounds that "evidenc[ing] that STAN LEE was employed by VISTA" is vague and ambiguous. Based on the parties' meet-and-confer discussions, MCI understands this Request to be seeking any employment Agreements (or any other Agreements with Lee relating to the future provision of services), hiring records, and letters and/or communications referring to Lee as an employee, freelancer, or independent contractor that are identified through a reasonably diligent search. MCI notes that it does not have any documents reflecting the tax treatment of payments to Stan Lee for the provision of services during the relevant time period, as MCI only has such documents beginning in approximately 1998. MCI will not produce those documents, given that privacy concerns significantly outweigh their probative value, in addition to the other objections MCI has raised with respect to this Request. With this understanding, and subject to these specific objections and the General Objections, MCI will produce responsive non-privileged documents in its possession, custody, or

- 28 -

control, if any, that are identified through a reasonably diligent inquiry and not otherwise subject to a protective order or confidentiality requirement.

Toberoff Decl. Ex. 5 at 20-21.

**REQUEST FOR PRODUCTION NO. 25:**
DOCUMENTS that evidence or reflect that RICO created the RICO MATERIAL as an independent contractor or freelancer.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 25:**
MCI objects to the Request on the grounds that it is overbroad, unduly burdensome, and implies an unfound legal conclusion through the use of the term "independent contractor or freelancer." Subject to these specific objections and the General Objections, MCI will produce non-privileged, responsive documents in its possession, custody, or control that evidence or reflect whether Marvel was Don Rico's employer when the Rico Material was created, if any, that are identified through a reasonably diligent inquiry and not otherwise subject to a protective order or confidentiality requirement.

Toberoff Decl. Ex. 5 at 31.

**REQUEST FOR PRODUCTION NO. 26:**
DOCUMENTS that evidence or reflect that RICO created comic book material published by MARVEL as a freelancer or independent contractor, including but not limited to, in the years 1963-1964.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 26:**
MCI objects to the Request on the grounds that it is overbroad, unduly burdensome, and implies an unfound legal conclusion through the use of the term "freelancer or independent contractor." Based on the parties' meet-and-confer discussions, MCI understands this Request to be seeking any employment Agreements (or any other Agreements with Don Rico relating to the future provision of services), hiring records, W-2s, documents reflecting the tax treatment of any such payments, and letters and/or communications referring to Don Rico as an employee, freelancer, or independent contractor during the time period from 1955 to 1985. With this understanding and the exception of offsite, hard-copy financial documents from 1980s and 1990s discussed between the parties, subject to these specific objections and the General

Objections, MCI will produce non-privileged, responsive documents in its possession, custody, or control that evidence or reflect whether Marvel was Don Rico's employer when comic book material published by Marvel was created by Don Rico, if any, that are identified through a reasonably diligent inquiry and not otherwise subject to a protective order or confidentiality requirement.

Toberoff Decl. Ex. 5 at 31-32.

**REQUEST FOR PRODUCTION NO. 27:**
All DOCUMENTS that evidence or reflect that RICO was an employee of any MARVEL entity, including but not limited to, in the years 1963-1964.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 27:**
MCI objects to the Request on the grounds that it is overbroad, unduly burdensome, and implies an unfound legal conclusion through the use of the term "employee." Based on the parties' meet-and-confer discussions, MCI understands this Request to be seeking any employment Agreements (or any other Agreements with Don Rico relating to the future provision of services), hiring records, W-2s, documents reflecting the tax treatment of any such payments, and letters and/or communications referring to Don Rico as an employee, freelancer, or independent contractor during the time period from 1955 to 1985. With this understanding and the exception of offsite, hard-copy financial documents from 1980s discussed between the parties, subject to these specific objections and the General Objections, MCI will produce non-privileged, responsive documents in its possession, custody, or control that evidence or reflect whether Marvel was Don Rico's employer when comic book material published by Marvel was created by Don Rico, if any, that are identified through a reasonably diligent inquiry and not otherwise subject to a protective order or confidentiality requirement.

Toberoff Decl. Ex. 5 at 32-33.

As to Lee's employment as editor, Marvel produced some evidence of this employment beginning in approximately 1968, but produced nothing relevant to the most important timeframe, the Creation Period. And worse, as to Don Rico, Marvel produced nothing.

### 6. Marvel Must Produce Plots, Scripts, or Outlines Relating to the Works.

Marvel also produced no plots, scripts, or outlines relating to Don Rico's Works, as requested. Again, as part of Marvel's alleged defense that the Works were created at its predecessor's "instance" it must show that it had the legal right to direct and supervise Don Rico's creation of the Works. Complaint ¶ 25; *see Martha Graham School & Dance Foundation, Inc. v. Martha Graham Center of Contemporary Dance, Inc.*, 380 F.3d 624, 635 (2d Cir. 2004) ("Instance" also requires that the employer have "the *right* to direct and supervise the manner in which the work is carried out," i.e., the creative process.) (emphasis original); *see also Self-Realization*, 206 F.3d at 1327 (finding no work-for-hire relationship because there was no evidence of the right to control the author). Acknowledging their relevance, Marvel has requested the plots, scripts, and outlines it or Lee allegedly gave to creators in its RFPs to the Ricos. *See e.g.*, Toberoff Decl. Ex. 6 at 12 (RFP No. 14). Similarly, the Ricos propounded RFP Nos. 37-38 seeking evidence to support Marvel's theory.

**REQUEST FOR PRODUCTION NO. 37.**
All DOCUMENTS that evidence or reflect any treatments, outlines, scripts, plots or storylines written by RICO for any MARVEL comic book in the years 1960-1965, including but not limited to the WORKS.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 37:**
MCI objects to this Request on the grounds that it is overbroad, unduly burdensome, and seeks documents that are not relevant to any issue in this action by seeking documents that are unrelated to the Works. Subject to and without waiving these specific objections and the General Objections, MCI will produce non-privileged documents in its possession, custody, or control that evidence or reflect any treatments, outlines, scripts, plots or storylines written by Don Rico during the years 1960 to 1965, if any, that are identified through a reasonably diligent inquiry and not otherwise subject to a protective order or confidentiality requirement.

Toberoff Decl. Ex. 5 at 39.

**REQUEST FOR PRODUCTION NO. 38:**
All DOCUMENTS that evidence or reflect any treatments, outlines, scripts, plots or storylines written by STAN LEE for the WORKS.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 38:**
MCI objects to the definition of "STAN LEE" as overbroad and burdensome insofar as it includes "any and all present or former agents, employees, representatives, attorneys, accountants, investigators, or any other person, acting or purporting to act on Stan Lee's behalf." MCI interprets "Stan Lee" to mean Stan Lee himself. Subject to and without waiving this specific objection and the General Objections, MCI will produce non-privileged documents in its possession, custody, or control that are responsive to this Request, if any, that are identified through a reasonably diligent inquiry and not otherwise subject to a protective order or confidentiality requirement.

Toberoff Decl. Ex. 5 at 39-40.

Marvel's alleged provision of scripts and plot outlines to Don Rico for the Works is central to Marvel's purported work-for-hire defense, yet it failed to produce a single one.

# IV.  MARVEL'S CONTENTIONS

Defendants' motion is wholly unwarranted because (1) they failed to meet and confer with MCI in earnest on the issues they raise; and (2) it is based on Defendants' blatant mischaracterizations of MCI's extensive discovery efforts and their unwarranted speculation that MCI may have additional documents— even though they know, based on MCI's discovery responses here and from their counsel's significant involvement in the *Kirby* litigation, that MCI does not have certain categories of documents from more than roughly sixty years ago.

## A.  The Motion Should Be Denied Because Defendants Failed to Meet and Confer on the Issues Presented.

Defendants portray themselves as having met and conferred *ad nauseum* with MCI, with MCI playing the role of the intractable adversary.  But the reality is quite the opposite.  While MCI has borne the brunt of actual discovery in this case—collecting, reviewing, and producing thousands upon thousands of documents—Defendants have focused their attention on a volley of accusations and drummed-up court battles.  For litigants so heavy on rhetoric and condemnation, Defendants have been quite light on document production (and really any form of reciprocal cooperation) themselves.

Defendants cite a lengthy string of discovery correspondence between their counsel and counsel for MCI.  But that they conferred about *some* issues does not mean the parties conferred about *these* issues before Defendants hastily served their stipulation.  Case in point, Defendants served their portion of this joint stipulation on August 1, yet the last purported meet-and-confer effort that they can cite occurred on June 15.  *See* Ex. 23.  (Equally egregious, even when the parties actually did meet and confer on the scope of MCI's production and/or search efforts, Defendants' motion seeks to renege on compromises reached during those conferral sessions.)

Had Defendants discussed the content of their motion in earnest *before* service, MCI could have tried to disabuse Defendants of the falsehoods and misunderstandings that underlie their motion. But they instead ran to the courthouse, diverting MCI's resources away from the actual practice of discovery and fact development to defending this spurious motion. Even further still, Defendants initially refused to toll MCI's time to respond to the joint stipulation while the parties engaged in post-service meet-and-confer efforts, with Defendants ultimately only agreeing to a week-long extension conditioned on MCI's agreement to give Defendants a reciprocal extension on MCI's concurrently served stipulation. Because Defendants failed to meet and confer in good faith about the issues presented in their motion, contrary to the Federal and Local Rules alike, their motion should be denied out of hand. *See* Fed. R. Civ. P. 37(a)(1); C.D. Cal. L.R. 37-1 ("Before filing any motion relating to discovery . . . , counsel for the parties must confer in a good-faith effort to eliminate the necessity for hearing the motion or to eliminate as many of the disputes as possible."); *see also, e.g.*, *Sanchez v. County of Sacramento*, 2020 WL 1984174, at *3 (E.D. Cal. Apr. 27, 2020) ("As the parties are aware, before bringing a motion to compel production, the movant must show that she conferred, or made a good faith effort to confer, with the party opposing disclosure before seeking court intervention. The burden of ensuring that proper meet and confer discussions take place is on the moving party." (internal citation omitted)).[22]

---

[22] Of course, such denial would be well within this Court's discretion. *See Rogers v. Giurbino*, 288 F.R.D. 469, 477 (S.D. Cal. 2012) ("A court can deny a motion to compel solely because of a party's failure to meet and confer prior to filing the motion.").

## B.     Defendants' Speculative and Unsupported Motion Should Also Be Denied on Its Merits.[23]

Even if this Court proceeds to the merits, Defendants' motion should be swiftly denied.  Their motion rests on the wrong legal standard and on unsubstantiated accusations and runaway speculation as to what documents Defendants hypothesize (wrongly) might be in MCI's possession or control.  But as this Court well knows, far more is required to warrant an order to compel.

### 1.     Defendants Misleadingly Frame the Dispute Before This Court by Citing the Wrong Legal Standard.

Defendants do not (and cannot) complain that MCI has refused to produce *any* category of responsive documents.  To the contrary, Defendants admit that they are asking this Court to compel MCI to produce categories of documents that MCI has already "agree[d] to produce."  Yet they employ the legal standard for evaluating a party's *objections* to discovery requests in an effort to try to shift the burden from them to MCI.  *See* Stip. at 10 (citing *Sec. & Exch. Comm'n v. Premier Holding Corp.*, 2021 WL 6104308, at *2 (C.D. Cal. Sept. 7, 2021), for the proposition that "[i]t is well-established that the burden is on the objecting party to show grounds for failing to provide the requested discovery").  That standard simply has no application here, where MCI has agreed to produce the requested documents that can be located.

With their motion, Defendants ask this Court to wade into the sufficiency of the productions and disbelieve MCI's representations that certain documents do not exist—another set of issues entirely.  And for that, the burdens are

---

[23] Defendants do not, and cannot, argue that MCI has refused to agree to produce any category of responsive documents.  Defendants nevertheless structured their contentions around categories of documents purportedly "in dispute."  Because MCI has already agreed to search for and produce documents in all these categories, MCI eschews Defendants' structure and instead demonstrates why Defendants' motion fails on its face.

flipped. Specifically, where, as here, a responding party represents that it does not have further responsive information, "[t]he burden is on the party seeking to compel discovery to cast doubt on the responding party's assertion that it does not have the requested information." *Gary Friedrich Enters. v. Marvel Enters.*, 2011 WL 2623458, at *1 (S.D.N.Y. June 21, 2011); *see also Bagdasaryan v. City of Los Angeles*, 2017 WL 10560536, at *7 (C.D. Cal. Nov. 1, 2017) (Scott, J.) ("[T]he moving party must have a colorable basis for its belief that relevant, responsive documents exist and are being improperly withheld."). "Mere suspicion" is not enough. *Bagdasaryan*, 2017 WL 10560536, at *7. In fact, "even an informed suspicion that additional non-privileged documents exist . . . cannot alone support an order compelling production of documents." *Kinetic Concepts, Inc. v. ConvaTec Inc.*, 268 F.R.D. 226, 252 (M.D.N.C. 2010).

To bear its burden, the moving party must be able to concretely articulate—with support—why there is reason to believe that responsive documents exist and have been withheld. *See Bal Seal Eng'g, Inc. v. Nelson Prod., Inc.*, 2018 WL 6258879, at *2 (C.D. Cal. July 9, 2018) (affirming Magistrate Judge Scott's denial of request to compel because the requesting party "had not 'provided any concrete evidence that [producing party] withheld relevant [] documents'"). Indeed, to sustain a motion to compel, courts often require a moving party to identify a *specific document (or documents)* that has been improperly withheld. *See, e.g.*, *Carter v. Dawson*, 2010 WL 4483814, at *5 (E.D. Cal. Nov. 1, 2010) (defendants' assertion that they are unable to locate responsive documents does not provide a ground for granting a motion to compel "unless Plaintiff can identify a specific document that Defendants have withheld"); *Ayala v. Tapia*, 1991 WL 241873, at *2 (D.D.C. Nov. 1, 1991) (denying motion to compel where moving party could not identify documents that were withheld). Because Defendants cannot meet this rigorous test, they

resort instead to ignoring it entirely (and, worse still, cite an inapposite standard).

### 2. Defendants Offer No Evidence to Meet the Applicable Standard, Rendering Their Motion Facially Deficient.

With the appropriate standard in view, Defendants' motion falls well short. Contrary to the applicable legal standard, it is based entirely on their unfounded speculation that MCI *may* have additional responsive documents. *See Bagdasaryan*, 2017 WL 10560536, at *7; *see also, e.g.*, *In re Lorazepam & Clorazepate Antitrust Litig.*, 219 F.R.D. 12, 17 (D.D.C. 2003) ("The federal courts are often confronted with a party's complaint that its opponent must have documents that it claims not to have. Such suspicion is, however, insufficient to warrant granting a motion to compel.").

Throughout their briefing, Defendants conflate willingness and ability to produce certain records. Although the former may be the proper subject of a discovery motion, the latter is not. After all, even the most cooperative litigant can only produce those documents that exist.

Defendants' expectations as to what MCI should be able to produce are unmoored from reality. They assert that it is implausible that MCI's archeological dig would not result in a complete recovery of all documents—that MCI must be hiding a cache of records dating back to its earliest years. But as they acknowledge, MCI's predecessors-in-interest were smaller, scrappier entities with lesser resources and sophistication than "the Marvel of today." While Defendants complain about the lack of records from the 1960s and early 1970s, the right of copyright termination did not even exist at the time—it was enacted with the Copyright Act of 1976. These entities had no reason to retain records refuting a not-yet-existent termination right that, in any event, would not apply to work-made-for-hire contributors like Don Rico.

Defendants themselves cannot get their story straight: They vacillate between contending that Marvel in the 1960s, on the one hand, "consisted of one alleged employee" and was far from "the Marvel of today," and on the other, is "a sophisticated, multi-billion-dollar operation" that "most certainly" has detailed records going back in perpetuity. Defendants imagine the reality that best suits their purposes, layering speculation atop speculation. Yet that is exactly what this Court has admonished against. *See Bagdasaryan*, 2017 WL 10560536, at *7.

Defendants also remarkably assert that the 1960s are "not so long ago" from a document retention standpoint—which is hard to take seriously for an era long preceding the corporate existence of "the Marvel of today," the advent of electronic records, and even the establishment of the very termination right that Defendants seek to assert. As Defendants are well aware, few witnesses from that time period are even still alive—not to mention that Don Rico died *nearly forty years ago*. It is against this backdrop—and their own decade-long delay in asserting their claim—that Defendants seek to minimize the impact of the passage of time.

Nor can MCI be blamed for Defendants' dilatory assertion of their purported termination right. Defendants claim a termination right in works whose copyright was first secured in 1964. Per the copyright termination statute, a notice of termination thus could have been served (if at all) as early as 2010.[24] Moreover, had Don Rico truly believed that he had not provided his services on a work-made-for-hire basis, he surely would have so advised Marvel at some point in the decade between the enactment of the termination right and his passing. Yet Defendants waited to assert this contrived "right"—an all too

---

[24] Under 17 U.S.C. § 304, termination may be effected 56 years from the date copyright was originally secured, and the termination notice may be served up to 10 years before the effective date.

convenient delay for parties trying to reimagine history. It is thus audacious for Defendants to fault *MCI* for any and all evidentiary degradation.[25]

Notwithstanding these obstacles, MCI has made several substantial document productions in response to Defendants' requests. To date, MCI has produced nearly 7,000 documents, comprising more than 70,000 pages. Defendants argue the size of MCI's production doesn't matter, because, in their view, the documents it produced are only marginally relevant. But that is simply inaccurate. MCI produced thousands of documents attesting to the way that Marvel historically operated—a practice so ubiquitous that it had a name, "the "Marvel Method."[26] Stan Lee, at the direction of Marvel's Martin Goodman,

---

[25] To be clear, MCI is not aware of any documentary evidence relevant to this lawsuit that existed in 2010 but does not exist today. Although not all witnesses remain living, fortunately their testimony—including that of Stan Lee—has been preserved and therefore will be proffered in this case.

[26] *See, e.g.*, Ex. 28 ¶ 4 ("Pursuant to what has been described as the 'Marvel Method', part of Stan [Lee]'s duties as Editor of the comic books was to come up with new ideas and new characters. All of the ideas and artwork had to be approved by Stan in his role as Editor. In the event of any dispute, Stan would always have the final say. It was Stan's customary practice to write the plots and scripts for the comics as well. . . . Stan would provide the artists with assignments and then review the artwork when the artists were done."); Ex. 29 ("'Everybody was "work-for-hire,"' says [Jack] Kirby. 'It was the traditional way that artists got jobs. The publishers made certain that they owned the rights to everything. When you came in for work, everything you did was owned by the guy giving you a paycheck.'"); Ex. 30 ¶ 8 ("In my [Stan Lee's] capacity as editor, I chose what I wanted to write, subject to [Martin] Goodman's approval, and also assigned the artist to draw the issue. Although I was given significant creative freedom, I continued to report to Goodman and understood that Goodman had the ultimate right to control the contents of the stories and to edit my work (and the work by anyone on my staff) if he deemed it appropriate. Indeed, there were several instances where Goodman edited materials that I had submitted for publication or suggested changes to storylines before the scripts were written. . . . [I]t was our mutual understanding and agreement throughout this entire twenty-three year period that my creative contributions were made as a result of my having been commissioned by [MCI's predecessor] as a result of

---

- 39 -

would assign out specific projects to writers and artists who he would oversee. Lee would plot out the comics, providing the direction and contours within which the assigned contributors would work. And he could—and did—request changes when desired to conform to his vision. These contributors were paid on a per-page basis, with no royalties and no expectations of authorship or ownership. It is ridiculous for Defendants to cast aside this core of materials because they are not unique to Don Rico; Marvel's practices were not unique to him, and therefore the supporting evidence need not be either.[27] Nor is Defendants' cynical speculation that MCI is "withholding those [documents] that are most critical to these cases" fair or remotely accurate; MCI has produced all of the non-privileged responsive documents it has located.

MCI has explained over and over again that it does not have the additional documents Defendants hypothesize. And Defendants have offered nothing beyond speculation to substantiate their contention that MCI has been anything less than forthcoming in discovery. Their "mere expectation and desire to see certain documents does not necessarily mean that such documents exist." *246 Sears Rd. Realty Corp. v. Exxon Mobil Corp.*, 2011 WL 13254283, at *2 (E.D.N.Y. Apr. 1, 2011). Because "[a] court cannot order a party to produce documents that do not exist," Defendants' motion must be rejected. *Bagdasaryan*, 2017 WL 10560536, at *7.

---

my having been commissioned by [it] to create the works, and that [MCI's predecessor] would therefore own whatever rights existed to any materials I created or co-created for publication by it . . . and that I had no right to claim authorship to or ownership of any of those works.").

[27] Moreover, MCI has been responding to Defendants' discovery requests as propounded, and to the extent they take issue with the relevance of the responsive documents to the ultimate issues in this case, that is a result of their own fishing expeditions; Defendants cannot hold MCI's dutiful compliance with their discovery requests as a strike *against* MCI.

### 3. MCI's Search Efforts Have Been More than Adequate, and Defendants' Request for Yet More Discovery on Discovery Should Be Denied.

Defendants served 56 RFPs on MCI.  Exs. 3, 32.  In each case, MCI confirmed it would produce responsive documents, within reasonable parameters agreed upon by the parties.  After extensive meet-and-confer efforts, Defendants verified that MCI had "satisfactorily addressed" their concerns "regarding Defendants' RFPs."  *See* Ex. 14.  MCI's amended RFP responses, served a week later, thus reflect the parties' "mutual understanding" as to the documents that MCI had agreed to produce.  *See id.*; *see also* Exs. 4, 33.

Over the last eight months, MCI has undertaken a multifaceted approach to identifying responsive documents.  MCI has, *inter alia*, (1) conducted an investigation into which physical and electronic repositories were reasonably likely to have responsive information; (2) searched the identified physical and electronic repositories, even where MCI believed that the physical and electronic repositories were duplicative; (3) worked with third-party individuals and entities to collect responsive documents in their possession; and (4) collected—at MCI's significant expense—documents located in the public record.  MCI respectfully refers the Court to its sworn interrogatory response on its collection efforts for further detail on this comprehensive process, which is attached hereto as Exhibit 31.  As a result of these efforts, MCI's production is already substantially complete and, subject to its right and obligation to supplement its production, will be complete by August 22, as MCI's sworn response confirms.

Other than their forced surprise that many records from the 1960s no longer exist,[28] Defendants offer *no evidence* supporting their offensive claims

---

[28] Marvel disclosed long ago that it does not possess certain records about which Defendants now feign ignorance.  *See, e.g.*, Ex. 34 at 3 ("Admitted that MARVEL does not possess copies of any checks issued to any freelance artists from MARVEL between January 1, 1950-January 1, 1964."); Ex. 35 at 4-5

that MCI did not conduct an adequate search or is withholding documents.  To

the contrary, the evidence unequivocally establishes that MCI has more than

complied with its discovery obligations.  For example, Defendants' speculation

that MCI "*may*" have relied on its searches in the *Kirby* litigation or did not

search its physical files is squarely refuted by MCI's sworn interrogatory

response.  *See* Ex. 31 at 12-22.  As another example, while Defendants suggest

that MCI's search for vouchers was inadequate, Defendants omit that the parties

*expressly agreed* on the scope of MCI's search for vouchers (with such

agreement reflecting that MCI does not have hard copy voucher files from the

relevant time period).  *See, e.g.*, Ex. 5 ¶ 26.[29]

Similarly, Defendants adopt an artificially narrow reading of MCI's

discovery responses, asserting that MCI collected electronic documents "based

solely on the keyword search 'Don Rico'" whereas "Don Rico's full name is

Donato Francisco Rico II and formal payment/tax documents are unlikely to use

his shortened name."  What MCI *actually* represented is that it would produce

responsive documents "identified through a reasonably diligent inquiry of

electronic searches identified with Don Rico's name."  Ex. 5 at 34-35.  Of

course, MCI's searching was not as short-sighted as Defendants proclaim; it

used the last name "Rico," as opposed to the narrower "Don Rico," so as to

capture records affiliated with "Don" and "Donato" alike.  MCI also searched

for "Korok," as N. Korok was the nom de plume that Don Rico used for the two

_____

(same as to certain later time periods).  Counsel for Defendants is completely
familiar with the record in *Kirby*, where the court had no difficulty concluding
that Jack Kirby worked at Marvel's instance and expense.

[29] *See also* Ex. 14 at 1 (confirming Defendants' understanding that "Marvel
would make a physical, as well as electronic, search for checks and/or other
payment documents from the relevant time period, but would not, as the parties
have agreed, search boxes containing payment documents solely dated from the
1980s, 1990s, or later").

Works at issue.  Although Defendants now protest the payment records search that MCI conducted, MCI performed the search exactly as agreed upon by the parties.

Notwithstanding the objective reasonableness of MCI's efforts, Defendants appear more interested in never-ending discovery on discovery— that is, Defendants' motion does not "bear on [a party's] underlying claim" but rather is "an attempt to prove [a party's] non-compliance with its discovery obligations."  *See 246 Sears Rd. Realty Corp.*, 2011 WL 13254283, at *4.  It is well established, however, that "'discovery on discovery' is disfavored and, to be both relevant and proportional to the needs of the case, a party seeking it 'must show a specific deficiency in the other party's production.'"  *Uschold v. Carriage Servs., Inc.*, 2019 WL 8298261, at *4 (N.D. Cal. Jan. 22, 2019).  The Court must "closely scrutinize" such requests "in light of the danger of extending the already costly and time-consuming discovery process *ad infinitum*."  *Perez v. DirecTV Grp. Holdings, LLC*, 2020 WL 5875026, at *2 (C.D. Cal. Aug. 17, 2020); *see also id.* ("When the discovery sought is collateral to the relevant issues (i.e., discovery on discovery), the party seeking discovery must provide an 'adequate factual basis' to justify the discovery.").

MCI simply cannot summon records from thin air.  Defendants refuse to accept reality, but that does not entitle them to a court order.  Where, as here, a party "assert[s] that they have produced all responsive documents . . . and the adversary believes the production is incomplete, the remedy is not to pound the table and ask the Court to order additional production."  *Sidman v. Concord Arena Parking, LLC*, 2021 WL 1940255, at *3 (E.D.N.Y. May 11, 2021).  Rather, "[i]n the absence of evidence to the contrary, [a party] is required to accept [the adversary's] response to this request that, despite a diligent search, no responsive documents exist."  *Sanchez*, 2020 WL 1984174, at *4; *Aardwolf LLC v. Aardwolf Indus. Sole Member LLC*, 2016 WL 6822750, at *14 (C.D. Cal.

May 2, 2016) ("[A] verification that no additional documents exist after a reasonable search is all that this Circuit requires.").[30]  Accordingly, Defendants' motion should be denied.

### C.     Defendants' Request Constitutes Harassment and an Abuse of the Discovery Process.

Lastly, Defendants' submission relies on Judge Kaplan's recent discovery order to suggest that he questioned MCI's discovery compliance.  Not so.  Judge Kaplan's order (1) *did not* find that MCI had withheld any responsive documents, (2) concluded merely that there was "no practical way" to determine which party was correct without a "costly and time consuming inquiry," (3) mandated production of only those documents "that can be found by a reasonably diligent search, subject to any prior and future agreements among the parties concerning the scope of the search(es) that [MCI] would previously or hereafter will undertake," (4) admonished Defendants that a further motion "could result in sanctions on defendants if it were not sufficiently supported," and (5) closed by reinforcing the need to "resolve any remaining disputes in a professional manner."  Ex. 26 at 2.

Yet Defendants immediately served parallel papers both in this Court and in the Eastern District of New York where another similar case is pending.  And they did so without warning, and without conferring, and without even waiting the few remaining weeks for MCI to complete its productions.  Moreover, when

---

[30] *See also, e.g.*, *Terpin v. AT&T Inc.*, 2022 WL 3013153, at *6 (C.D. Cal. June 13, 2022) ("In the absence of a demonstrated deficiency, . . . Plaintiff's speculation about possible deficiencies in Defendant's search procedures do not support an order compelling [Defendant] to produce discovery based upon new search terms after it has produced a large volume of documents and largely completed its production."); *Madden v. Abate*, 2010 WL 11610365, at *2 (D. Vt. Dec. 22, 2010) ("[Plaintiff], insofar as she represents that she has already produced all responsive documents, should be taken at her word.").

MCI reached out to confer after receiving Defendants' joint stipulation, Defendants refused to agree to a date certain for their productions and tried to insist that MCI agree to a number of punitive conditions in exchange for withdrawing their premature and improper letter.  *See* Ex. 36.  Such gamesmanship should not be rewarded—especially where it is *Defendants* who have refused to comply with their discovery obligations.

## V.   **THE RICOS' CONCLUSION**

For the foregoing reasons, the Ricos respectfully request an order compelling Marvel's immediate search for and production of all non-privileged documents responsive to the RFPs detailed above and to execute a due diligence declaration describing (i) where and how it looked for physically stored responsive documents, (ii) where and how it looked for electronically stored responsive documents, including each search term employed, and (iii) affirming that it has already or will produce all non-privileged, responsive documents. *See Premier Holding Corp.*, 2021 U.S. Dist. LEXIS 246096, at *13.

## VI.   **MARVEL'S CONCLUSION**

For the foregoing reasons, Defendants' motion to compel discovery should be denied in full.  MCI has made every effort to resolve the subject of this motion without court intervention—including (1) by agreeing to produce the documents it can reasonably locate in each requested category, and (2) by proposing that the parties stipulate to a reciprocal agreement to complete their productions by August 22, but Defendants refuse to hold themselves to the deadline they seek against MCI.  Defendants' conduct has thus left MCI with no choice but to serve Defendants with a joint stipulation.  If Defendants' motion is not denied outright, and to the extent Defendants' deficiencies are not resolved by their own volition, MCI asks that the Court address these cross-motions in tandem during a single conference.

Respectfully submitted,

Date: August 16, 2022       **TOBEROFF & ASSOCIATES, P.C.**

By:   */s/ Marc Toberoff*
           Marc Toberoff

*mtoberoff@toberoffandassociates.com*
23823 Malibu Road, Suite 50-363
Malibu, CA 90265
Telephone: (310) 246-3333
Facsimile: (310) 246-3101

*Attorneys for Michele Hart-Rico and*
*Buz Donato F. Rico III, heirs of*
*Donato Francisco Rico II*

Dated:  August 16, 2022       **O'MELVENY & MYERS LLP**

By: */s/ Daniel M. Petrocelli*
           Daniel M. Petrocelli

Daniel M. Petrocelli
*dpetrocelli@omm.com*
Molly M. Lens
*mlens@omm.com*
Danielle Feuer
*dfeuer@omm.com*
1999 Avenue of the Stars, 8th Floor
Los Angeles, California  90067
Telephone: (310) 553-6700
Facsimile: (310) 246-6779

Allen W. Burton (admitted *pro hac vice*)
*aburton@omm.com*
Times Square Tower

7 Times Square
New York, NY 10036
Telephone: (212) 326-2000
Facsimile: (212) 326-2061

Kendall Turner
*kendallturner@omm.com*
1625 I Street NW
Washington, DC 20006
Telephone: (202) 383-5300
Facsimile: (202) 383-5414

*Attorneys for Marvel Characters, Inc.*

Pursuant to Local rule 5-4.3.4(a)(2)(i), the filer attests that all other signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing.

Date: August 16, 2022

**TOBEROFF & ASSOCIATES, P.C.**

By: */s/ Marc Toberoff*
Marc Toberoff

*Attorneys for Michele Hart-Rico and Buz Donato F. Rico III, heirs of Donato Francisco Rico II*