UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION - LOS ANGELES


| | | |
|---|---|---|
| MARVEL CHARACTERS, INC, | ) | CASE NO: 2:21-CV-07624-DMG-KESx |
| | ) | |
| Plaintiff, | ) | CIVIL |
| | ) | |
| vs. | ) | Santa Ana, California |
| | ) | |
| MICHELE HART-RICO, ET AL, | ) | Tuesday, September 6, 2022 |
| | ) | |
| Defendants. | ) | (10:05 a.m. to 10:51 a.m.) |


TELEPHONIC HEARING RE:

DEFENDANTS' MOTION TO COMPEL MARVEL'S PRODUCTION OF DOCUMENTS
[DKT.NO.37]


BEFORE THE HONORABLE KAREN E. SCOTT,
UNITED STATES MAGISTRATE JUDGE


<u>APPEARANCES</u>:                SEE PAGE 2


Court Reporter:            Recorded; CourtSmart


Courtroom Deputy:          Jazmin Dorado


Transcribed by:            Exceptional Reporting Services, Inc.
                           P.O. Box 8365
                           Corpus Christi, TX 78468
                           361 949-2988




Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

<u>**APPEARANCES**</u>**:**


**For Plaintiff:**            **DANIEL M. PETROCELLI, ESQ.**
                             **MOLLY M. LENS, ESQ.**
                             **MATT KAISER, ESQ.**
                             **O'Melveny & Myers**
                             **1999 Avenue of the Stars**
                             **8th Floor**
                             **Los Angeles, CA 90067**


**For Defendants:**          **MARC TOBEROFF, ESQ.**
                             **JAIME PARKKINEN, ESQ.**
                             **Toberoff & Associates**
                             **23823 Malibu Road**
                             **Suite 50-363**
                             **Malibu, CA 90265**

1       **Santa Ana, California; Tuesday, September 6, 2022; 10:05 a.m.**

2                              **(Telephonic Hearing)**

3                                   --oOo--

4           **THE COURT:**  Good morning.  This is Judge Scott

5     joining the call.

6           **THE CLERK:**  Hello, Your Honor.  This is Jazmin

7     Dorado.  And we are now on the record, on Case Number 2:22CV --

8     no, I'm sorry -- 21-cv-7624-DMG-KES; Marvel Characters,

9     Incorporated, versus Michele Hart-Rico, et al.

10          Counsel, please go ahead and state your appearances

11    for the record.

12          **MS. LENS:**  Good morning, Your Honor.  This is Molly

13    Lens.  I'm here with my partner, Daniel Petrocelli, and

14    colleague, Matt Kaiser, for Plaintiff Marvel Characters, Inc.

15          **MR. TOBEROFF:**  Good morning, Your Honor.  This is

16    Marc Toberoff.  I'm here with my associate, Jaymie Parkkinen,

17    on behalf of the Defendants, the Ricos.

18          **THE COURT:**  Good morning, Counsel.  We are here for a

19    telephonic hearing on a discovery motion that was filed

20    earlier.  It's on the docket, at Numbers 37 and 38.

21          Generally it is a motion filed by the Defendants and

22    cross-complainants.  But the Rico parties, seeking to compel

23    Plaintiff and cross-Defendant Marvel to produce documents or

24    additional documents in response to a number of Requests for

25    Production that are listed in the motion.

4

1          The Court has reviewed the moving papers, and will

2    invite the moving party to go ahead and address the Court and

3    highlight anything that you want to highlight or add to the

4    papers.

5          **MR. TOBEROFF:**  Thank you, Your Honor.  This is Marc

6    Toberoff speaking on behalf of Defendants and counter-

7    Claimants, the Ricos.

8          As Your Honor may know, there are five cases dealing

9    with notices of termination in addition to this one.  There are

10   three in the Southern District of New York dealing with such

11   characters as Spider-Man, Doctor Strange, Thor, Iron Man, and

12   one in -- those are in the Southern District of New York.  And

13   there's one in the Eastern District of New York.

14         A relevant period is approximately, over these cases,

15   1961 to 1976.  And with respect to this case, which deals with

16   one character and one creator, Don Rico -- and the character is

17   Black Widow -- the general time frame is 1962 to 1967, to put

18   this in perspective.

19         Marvel produced very few documents dealing with the

20   broader period from 1961 to '76, and even fewer dealing with

21   the period '62 to '67, relevant to this case.

22         They -- we had a system where they insisted on a glop

23   -- conglomerated production, and would denote which documents

24   in the production are applicable to which case.  And they were

25   only 12 documents applicable to Ricos and Black Widow, by their

1   own designation.

2          We first moved to compel on behalf of the Defendants

3   and counter-Claimants in the three Southern District cases.

4   Judge Kaplan granted that Motion to Compel its entirety.  In

5   opposition to that motion and in the meet-and-confer process,

6   Marvel had made identical statements to the type of statements

7   it's making here.

8          Namely, that they can't magically produce documents.

9   "We can't summon documents from thin air.  We can't produce

10  documents that we don't have."

11         Yet after being compelled to do so, with respect to

12  different creators and different works, they produced 10,000

13  additional pages of relevant documents, losing a tremendous

14  amount of credibility in the process.

15         We didn't have, Your Honor, even one letter from Stan

16  Lee.  And we've been asking consistently for Stan Lee's

17  correspondence.  Because he was very gallous and wrote a lot

18  about the period and about the characters and fan mail.

19         And there was one letter in there where he's

20  discussing the very character at issue in that case, Black

21  Widow, which was never produced in this case until it was

22  produced in the Southern District.

23         In addition, Marvel's claim that it has no documents

24  is unpersuasive for a number of other reasons.  I'll try and

25  give you the highlights.

1            There have been many books published on the history

2    of Marvel.  Many were published by Marvel itself; two, by Stan

3    Lee, in 1974 and 1975.  But then there are other books that

4    were published in 2017, 2019, 2020.  These contained excerpts

5    from evidence.

6            And obviously the editorial process, they're not

7    including all the evidentiary documents on which you base the

8    history of Marvel in the book.  Where are those documents?

9    Again, very few have been produced in the relative -- relevant

10   period.

11           There have been an appalling lack of Stan Lee

12   documents.  He was with Marvel for 80 years.  In addition,

13   Marvel uses the excuse that it's been purchased and merged with

14   other companies.  Actually, that works the opposite.

15           So in 1968, Marvel was purchased.  Marvel was -- and

16   we've argued this -- small and fragmented in the early 60s.

17   But by 1968, they were being purchased by Cadence Industries, a

18   much bigger company, that has document retention protocols and

19   files.

20           And in the process of being purchased -- you know,

21   it's like -- like buying my house.  Your house, oh, it looks

22   great at the beginning.  And then you sell it.  Because you fix

23   it up to sell it.  Here, the whole value of Marvel is based on

24   its character assets.  And, obviously, before Cadence bought

25   Marvel in '68, it had to put its chain of title in order.

1          They argued termination didn't exist.  But (indisc.)

2    is their supposed basis for authorship and ownership of these

3    characters.  So documents relevant to that would have been

4    retained, and their chain of title would have had to have been

5    proven to Cadence in 1968 -- who obviously would have kept

6    these documents, because these characters grew and grew and

7    grew in value.

8          The other thing, which is contextual and very

9    important here, is it's not like we served Requests for

10   Production, and Marvel responded by saying, "We'll give you all

11   relevant -- we'll give you all responsive documents in our

12   possession."

13         We've had to bring Marvel, kicking and screaming,

14   every inch of the mile here.  They started out with cut-and-

15   pasted, boilerplate objections.  We then had exchanged about 12

16   meet-and-confer letters with Marvel.  We had four meet-and-

17   confer sessions with Marvel.

18         At a certain point, they finally agreed to produce

19   responsive documents.  And then they produced 80,000 pages in a

20   document dump, very few applicable to the period in question.

21         And then when we -- when we -- they point to ROGs

22   that they answered in a different case dealing with Rico-Solo,

23   which -- the credit is Gene Colan.  They're the heirs.

24         And their responses in their ROGs -- first of all,

25   that's a different case.  In their ROGs, they objected to the

8

1  use of the ROGs in any other case (indisc.) pointing to those

2  ROGs.

3          But if you look at the answers to their ROGs, and you

4  look at their opposition -- and it takes a great deal of

5  (indisc.) effort to do this.

6          They are -- they only speak in conclusionary general

7  terms.  We ask them questions -- in other words, they say --

8  they repeat the phrase that they made diligent search of their

9  electronic and physical records.

10          When asked, "What search terms did you use?" --

11  because we're trying to get to the bottom of why there's such a

12  dearth of documents from this golden age of Marvel and all

13  these great iconic billion dollar characters were created.  Why

14  are there no documents?

15          They don't -- they didn't tell us their search terms.

16  They wouldn't outline their search terms.

17          When we asked, "Where are you physical records

18  located?  All in one place or in several places?"  They

19  wouldn't answer that question.  We asked, "Who made the

20  searches?"  They wouldn't answer these questions, relying

21  instead on these broad statements.

22          The sum total, when you put all of these things

23  together, is that we believe that if Marvel is compelled to

24  produce documents, it is compelled to sign a due diligence

25  declaration, under oath, and that they have given us all

1  documents in their possession, that we are going to see a

2  different result, just like we did in the Southern District of

3  New York.

4           Thank you, Your Honor.

5           **THE COURT:**  Thank you.

6           I will let Counsel for Marvel go ahead and address

7  those points.

8           **MS. LENS:**  Hi.  Yes.  Good morning, Your Honor.  This

9  is Molly Lens for the Plaintiff, Marvel Characters.  There's a

10 lot there that I do feel compelled to reply to.

11          If at some point, you would like to take a step back

12 up and sort of look at the national level, I'm happy to do that

13 as well.  And perhaps that's where I'll close.

14          But there are a number of arguments by the Ricos

15 that, not surprisingly, we don't agree with.  So I will just

16 say, at the outset, that we've done extended efforts, over

17 many, many, many months.

18          We've tried to work with the Defendants, despite the

19 picture that you see here.  We've tried to be collaborative.

20 We've tried to provide reassurances that we have done -- you

21 know, we have done a diligent search for documents.

22          But let me start by trying to go through some of the

23 points by the Ricos.

24          First of all, there are not only 12 documents that

25 relate to Black Widow or these cases.  We addressed this with

10

1    perception in our papers.  But as the Ricos mentioned, we've

2    produced one set of documents across all five cases, which all

3    relate to generally the same time period.

4           And as Your Honor may be aware, you know, there was

5    no mystery with respect to how Marvel conducted business with

6    its contributors over this time period.  It was in fact so

7    well-known that there was a term -- you know, a phrase coined

8    for it, which was "The Marvel Method."

9           And so we've produced countless pages and documents

10   and testimony and interviews, including by the creators in

11   question here, with respect to how generally they worked over

12   this time period.  And we did not agree.

13          We specifically told the Defendants, when we reached

14   disagreement about how the documents were going to be produced,

15   that all the documents could be produced across all -- would be

16   used across all of the cases.

17          And so it just -- you know, to the extent that we

18   were able to identify a specific document that uniquely related

19   to the Ricos -- for example, the termination notices or the

20   copyright registrations that relate to works that are at issue

21   in that case -- we designated them (indisc.), but didn't

22   designate the vast majority of the documents that we produced.

23          You know, we've been hearing a lot, both in the

24   papers as well as today, about Judge Kaplan's decision in the

25   Southern District, who had three of these related cases.  You

11

1    know, that was a motion that was decided on the papers.

2            And I hope Your Honor has had an opportunity to look

3    at it.  It is attached as Exhibit 26 to Mr. Toberoff's

4    declaration.  But in that order, Judge Kaplan makes clear that

5    he's not able to resolve, on the papers, which party is right

6    with respect to their various arguments.

7            And since he recognized that Marvel had agreed to

8    produce the documents in question, he more or less effectively

9    just gave us a date, August 22, on which to complete our

10   production, but went out of his way to say that it would be

11   subject to the prior and future agreements amongst the parties

12   concerning the scope of the searches that the Plaintiffs will

13   hereafter undertake.

14           But, unfortunately, I have, with this purest victory,

15   if you will, the Defendant has filed this motion, accusing us

16   of wrongdoing and saying that our discovery misconduct led to

17   Kaplan's order, when, on its face, Kaplan said he didn't know

18   which party was right.

19           And, you know, the Ricos are arguing that we'll only

20   produce documents when ordered to do so.  And we just heard

21   their 10,000-page figure to support that argument, that we've

22   produced over 7,000 documents in this case.

23           And I think "documents" here is the relevant metric;

24   not pages.  And in fact that's a point that the Defendants

25   (indisc.) in their opening brief, on page 9, where they said we

1    shouldn't be looking at pages produced; we should be looking at

2    total of documents.

3          But in any event, at the time of the Kaplan order, we

4    had produced nearly 7,000 documents.  After that, we produced a

5    grand total of, I believe, 381 documents.

6          And the reason that the page count is so high is

7    because our final two productions contained a number of

8    publicly available sources, such as the books that the Ricos'

9    attorney was just mentioning.

10          So, you know, we produced the entire books that we

11    purchased and scanned and produced.  But that's why the page

12    count is so high.  But if you look at the actual document

13    count, it's 381.  And at the time of the Kaplan order, we were

14    upfront that we hadn't completed our production.

15          He then gave us -- Judge Kaplan gave us until August

16    22 to complete.  And that's precisely what we did.  But the

17    vast majority of the documents had been produced prior to Judge

18    Kaplan's order.

19          Now, we've heard the Ricos' attorney make two

20    arguments with respect to Stan Lee's documents.  They say a

21    document that we produced in one of our final productions,

22    saying that it was correspondence from Stan Lee relating to

23    Black Widow, and, therefore, that shows that we're only

24    coughing up relevant documents when ordered to do so.

25          Now, this document, as the metadata that we provided

13

1    to the Defendants shows, were broader documents that came from

2    Marvel's files.  This is a document that we managed to track

3    down from another individual who doesn't work with Marvel.  So

4    this is something -- and we gave custodial that, as it shows

5    that it came from this third party.

6            And so it's just not accurate for the Ricos to argue

7    that this was a document that we miraculously found in our

8    files after Judge Kaplan's order.

9            And, again, they mention that they produced Stan

10   Lee's correspondence, and say we should also have this Stan Lee

11   correspondence.  But if you look at the correspondence that

12   they cite -- or, you know, that they attached to their

13   briefing, it's a letter that Stan Lee exchanged with Rico.

14   And, in it, Stan Lee talks about how he's at his house.

15           We don't have access to Stan Lee's personal

16   correspondence.  And so this is a document that, on its face,

17   you would not expect to find in the Defendant -- excuse me --

18   in Marvel's files.

19           So I know that I'm really down in the -- in the weeds

20   here, Your Honor.  But I do think that, when close examination

21   of these purported examples of concern, they just don't hold

22   up.  And we have, you know, produced -- we provided extremely

23   detailed interrogatory responses.  And they are attached to our

24   -- excuse me -- to my declaration as Exhibit 35.  We've

25   actually since updated those yet again.

14

1          But if Your Honor hasn't already, again, I would

2     encourage you to -- to review those.  We provided -- we're not

3     relying, as Counsel stated, on general statements with respect

4     to what we searched and where we searched.  We've provided

5     detailed interrogatory responses that explain where we searched

6     for electronic documents, where we searched for electronic --

7     physical documents.

8          I don't believe that the Defendants had raised --

9     after receiving those interrogatory responses, they haven't

10    articulated any searches that they would like us to do that we

11    haven't done, with the exception of the searching for the Black

12    Widow search term.

13         But as we explained in our papers, we searched for

14    various iterations of Don Rico's name; we've searched for his

15    pen names, we've searched for the copyright claimant in that --

16    in that case.  And, you know, they argue in their papers that

17    we would have found that quote, unquote, correspondence from

18    Stan Lee in our files had we run Black Widow.

19         But, again, that's not the case.  That was not a

20    document that was found in our files.

21         And the issue of search terms, Your Honor, was an

22    issue that we raised after these -- after they rushed to file

23    this -- this motion.  They never thought to engage with us with

24    respect to the search terms, much less proposed search terms.

25         And even though they proposed search terms after they

1    filed their motion, we nevertheless endeavored to run a great

2    deal of those search terms.  And as we've explained in our

3    papers, the terms just were not fruitful.

4         Rather, we viewed that as really a stopgap in

5    confirming that, even once we ran the overwhelming majority of

6    the Defendants' requested terms, we weren't identifying

7    additional documents.  It just underscores that we have done a

8    reasonably diligent search.

9         So as I indicated in the beginning, I'd like to close

10   by taking a step back, which is just that we have done a

11   reasonably diligent search with respect to our own files.  We

12   have provided information, under oath, with respect to the

13   scope of those searches.  We've answered the Defendants'

14   questions about why their suspicions are not accurate.

15        In contrast -- and I understand Your Honor doesn't

16   want to hear our motion today.  But I do think that it is

17   important to understand that, in contrast, the Defendants

18   themselves are refusing to provide a certification that Marvel

19   has already provided with respect to the diligence of its

20   searches, as well as the completion of its searches.

21        Obviously, there may be additional documents that

22   come to our attention that's consistent with our obligation to

23   supplement our productions we will do.  But we have provided a

24   certification, under oath, as to the diligence of our searches

25   and the fact that we believe that our productions are complete.

1          And on the other hand, we've identified real issues

2   that we have with the Defendants' productions.  And they

3   haven't even given us a certification.

4          So, at least, we think it's very important that the

5   parties understand what the rules of the road here are and that

6   there's parity between -- between the parties.

7          So I'd be happy, Your Honor, to answer any questions

8   that you may have with respect to either the record or our

9   (indisc.) extensive search efforts.

10         **THE COURT:**  One of the items that I heard from the

11  opposing party was an allegation that Marvel had not told them

12  what search terms Marvel had used or told them where they had

13  physically searched for documents.  I understand you to be

14  disputing that.

15         Can you give us a little more detail on those items,

16  and what was communicated to the Rico parties about those

17  search efforts and how?

18         **MS. LENS:**  Yes, of course, Your Honor.

19         Well, with respect to the search terms, as I

20  mentioned, the search terms -- Defendants raised those issues

21  after they served us with their joint stipulation.  So a lot of

22  that occurred, you know, while we were briefing the opposition

23  to the motion and trying to get them, frankly, to withdraw

24  their motion.

25         But if you look at Exhibit 35 to my declaration -- it

1    is our first supplemental responses to a set of

2    interrogatories.  Yes, they were served in the Colan case,

3    which is the case in the Eastern District of New York.  But if

4    you look at our responses, even though we objected to the fact

5    that the Defendants have been using interrogatories selectively

6    across the cases so as to evade their voluminosity limit, we

7    nevertheless answered, in Exhibit 36, as to all of the cases.

8           And so if you look, for example, on pages 12 through

9    -- 12 through 23 of Exhibit 36, you'll see detailed information

10   with respect to where we searched and what we've done to

11   search.

12          And then in -- after -- as I mentioned, they actually

13   berate the search terms while the briefing was occurring, so we

14   supplemented the interrogatory yet again.  This is not part of

15   the record due to the timing.  But on August 26th, we

16   supplemented our interrogatories again and explained again with

17   respect to the search terms.

18          We've never provided them with -- with a -- like a

19   complete list of the terms.  But I'd be happy to do that.  And

20   I'd also be happy to provide you with a copy of the August 26th

21   supplemental interrogatory responses.

22          Which, you know, frankly, we endeavored to provide

23   them with a lot of detail because we're proud of the searches

24   that were done and think that the searches speak for

25   themselves.

18

1          **THE COURT:**  Thank you.

2          Mr. Toberoff, as the moving party, I will let you

3     have the last word if there's anything more that you'd like to

4     add.

5          **MR. TOBEROFF:**  Yes.  First of all, going back from

6     the last statement that were made, Your Honor asked a very

7     simple question.  "Did you identify the location, the -- where

8     you have physical documents?  Is it at one location?  Are there

9     several locations?  And were each of those searched and to what

10    extent?"  That question was never answered by Counsel.

11    Instead, she made repeated reference to ROG responses.

12         She did finally answer the question about the search

13    term.  They did not provide the search terms.  They refused to

14    provide the search terms.  They selectively provided certain

15    search terms, but never a list that the search terms employed.

16         And we made suggestion as to search terms, trying to

17    help this process because of the -- I mean, I don't know how

18    else to say it.

19         There is an -- for all the talk, there is an

20    appalling lack of documents from 1961 and 1976, where all of

21    these billion dollar characters were created and started to go

22    up in value so much so that they were bought in 1968.  The

23    company was bought in 1968 as mention.  It's just an appalling

24    lack of documents.

25         And there's a gargantuan effort to evade and

1   obfuscate.  When you put those two things together, and you see

2   such a lack of Stan Lee documents, and how it's pulling teeth

3   to get the most basic responsive documents, there is just a

4   loss of credibility.

5          I can't -- if half the effort, or a fraction of the

6   effort, that has gone into fighting us in discovery, has gone

7   into searching for documents, we wouldn't be here today, Your

8   Honor.

9          **MS. LENS:**  Your Honor, may I quickly respond to that?

10          **THE COURT:**  Very briefly.

11          **MS. LENS:**  Yes.  And so I wasn't going to read you

12   the response to our inter -- first of all, they did the Motion

13   to Compel; not a motion with respect to the interrogatories

14   that we -- that we answered.

15          But if you actually look at the interrogatories, if

16   you review them -- and we could review them together.  But I

17   suggest that it might be a lot more efficient use of time for

18   the Court to review them.

19          But it does.  They detail where we've looked for

20   documents.  They detail every -- the different areas of the

21   company that we've looked for documents.

22          And so, you know, unfortunately, there is some --

23   there's significant suspicion on both sides.  But the law is --

24   you know, we've complied with our obligations.  And I think

25   that the (indisc.) file that we cite supports that where a

20

1   party here has made a certification that it has complied with

2   its discovery obligations.  But, you know, and there's no

3   evidence to suggest that that's incorrect.

4           You know, we take our position as officers of the

5   Court very seriously.  And these are serious accusations the

6   Defendants are making.

7           But we have, I think -- the Ricos' Counsel argues

8   that there's an appalling lack of documents.  But we're talking

9   about documents from the 1960s and '70s.  And I would also

10  respectfully submit that there isn't a lack of documents.  That

11  just the documents that exist don't support the Defendants'

12  position.

13          And so they're looking for more.  But we produced

14  what have.  And we respectfully request that the motion be

15  denied.

16          **MR. TOBEROFF:**  Your Honor, may I correct a couple of

17  things?  Because I was supposed to have the reply and she just

18  made a sur-reply.  If I could?

19          **THE COURT:**  That's fine.  Very briefly.

20          **MR. TOBEROFF:**  Okay.  So, first of all, they have

21  never verified, under oath, "We have produced all non-

22  privileged responsive documents in our possession, custody, or

23  control."

24          All they've done is verify that we had substantially

25  completed production on August 22nd.  That's the problem; that

21

1    they're saying production is substantially complete and are no

2    doc -- hardly any documents from the period and very few

3    documents relevant to this case.

4          By the way, their ROG responses in a different case,

5    even if it's a related case, are not responsive about their

6    searches in this case.  It's not all the same thing, though

7    they put it all in one hopper.

8          Thank you, Your Honor.

9          **THE COURT:**  The Court appreciates those arguments

10   from Counsel.  The Court did have an opportunity to review the

11   papers and the exhibits.

12         With respect to the relief requested in this

13   particular motion, the Court looked at the proposed order that

14   was filed by the moving party, at Docket 37-1.  Because that

15   was the document that specifically put forth what findings the

16   moving parties wanted the Court to make and what orders they

17   were asking the Court to enter as a result.

18         And so the Court is prepared to rule on those issues,

19   and will announce its ruling now.  I can tell you in advance to

20   facilitate your note-taking efforts.  But what the Court

21   typically does is announce rulings at the hearing, and then

22   enter a minute order that says that the rulings were stated on

23   the record.

24         The parties are free at that point to order a

25   transcript.  If the prevailing party prefers, the prevailing

22

1  party can submit a proposed order for the Court's review, and

2  the Court will enter that as it comports with the rulings that

3  were announced.  The prevailing party is invited to do that if

4  they think it would be helpful, but they are not required to do

5  that.

6          So with respect to the proposed order, the first

7  finding that the moving parties have asked the Court to make is

8  that the RFPs are all directly relevant.

9          And the Court declines to make that finding.  I think

10  that the presentation of the relevancy arguments in the papers

11  was not very specific to particular RFPs that were in dispute.

12          As the Court reviewed those objections, it appeared

13  that Marvel had raised appropriate relevancy objections to at

14  least some of the RFPs, that there had been efforts to narrow

15  some of them through the use of more narrow defined terms.

16          And so, as presented in the current motion, the Court

17  is going to decline to overrule all of the relevancy objections

18  as requested.

19          The next finding that the Court is being asked to

20  make is that there are seven subsidiaries or affiliates or

21  parent of Marvel, and that Marvel exercises sufficient control

22  over all of those entities; that any documents that those

23  entities have would be considered in the possession, custody,

24  or control of Marvel for purposes of discovery.

25          Again, the Court declines to make that finding.

1          The moving papers here didn't really discuss those

2     entities.  Many of the main names weren't even mentioned, but

3     alone providing the factual evidence that would be needed to

4     make this kind of determination about possession, custody, or

5     control.

6          The next finding that the Court is being asked to

7     make is that Marvel's search efforts have not satisfied its

8     obligation under the Federal Rules that they were not done

9     reasonably or diligently.

10         Here, the Rico parties have the burden, since this is

11    their motion.  And the Court does not find that they have

12    satisfied that.  On the other hand, the Court's not going to

13    rule affirmatively and make findings that the searches were

14    reasonable and diligent.

15         The Court just finds that the 10,000-level arguments

16    that were being presented here are -- are not sufficient, and

17    that there appears to be ongoing efforts to meet and confer

18    amongst the parties about search terms and so forth.

19         And so the Court does not rule on that issue.

20         The Court will direct that Marvel provide a meet-and-

21    confer letter consistent with some of the representations that

22    were made earlier, so that if this information hasn't already

23    been provided, it will be provided.

24         And that is a discussion -- or an identification of

25    what search terms Marvel has used.

24

1          Marvel can feel free, if they've used other search

2     terms and found no hits or found so many hits that they

3     determined those search terms weren't good search terms.   They

4     can disclose that as well.   That's going to help the meet-and-

5     confer process over what would be appropriate search terms.

6          With regard to physical location, the -- rather than

7     relying on the very lengthy interrogatory response that the

8     parties seem to have some disagreement over what was really

9     there and what wasn't and what applies to this case and so

10    forth, content can be extracted from that or can be week dated

11    by Counsel based on their own understanding, that identifies,

12    you know, what did Marvel do to figure out where some of these

13    physical documents might be; what physical locations of

14    documents have been searched; in general, how have they been

15    searched.

16         And if there were some that they determined not to

17    search, based on the burden or the way the documents were

18    organized to identify that, that -- it does not have to be

19    under oath.   Again, the purpose of this is to facilitate meet-

20    and-confer discussions between Counsel.

21         The Court would expect Marvel to be able to provide

22    that letter within two weeks.   And the parties can further meet

23    and confer from there.

24         The next items that are listed on the proposed order

25    is a request that the Court order Marvel to search every

25

1    physical repository of documents that have and might have

2    responsive records, and every electronic database that might

3    have responsive records.

4            And, again, the Court's going to decline to enter an

5    order like that.

6            That is a bit of a sledge hammer in a situation that

7    requires more nuance.  There's always a tradeoff in terms of

8    burden and cost and reasonableness of how to do searches.  And

9    it seems that the parties just need to meet and confer, and

10   come up with an understanding of what has been done, and if one

11   party asserts that what has been done isn't enough to be able

12   to articulate that, based on their understanding of what has

13   been done.

14           There is a request in the proposed order that the

15   Court order Marvel to use a whole list of search terms.

16           The Court is going to decline to order that.

17           Many of those search terms appear like they could be

18   overly broad depending on what database they're being used in.

19   It is far better for the parties to try and come up with

20   reasonable search terms on their own, rather than having the

21   Court wordsmith search terms.

22           It doesn't appear from the record that there has been

23   a robust meet and confer over the appropriateness of the search

24   terms that are listed here in the proposed order.

25           You know, some of the terms, like "vista" may appear

1    in many different contexts.  And the Court can imagine getting

2    many hits that would not be to relevant documents.

3           I don't cite that is the only example.  But just one

4    example of why it is better for the parties to try and put

5    their heads together jointly and be reasonable and not come to

6    the Court with, you know, requests that have not been the

7    subject of good meet-and-confer dialog, in which -- which

8    really asks for, you know, all or nothing.

9           We're at the request at the final paragraph of the

10   proposed order that Marvel execute a due diligence declaration

11   affirming that it already has produced all these documents.

12          And, again, the Court's not going to enter that.

13          The Court finds some of the objections may have been

14   well-stated, and that the arguments in the current briefing

15   aren't enough to overrule particular objections as to

16   particular RFPs.

17          So that will be the ruling of the Court.

18          As I prefaced that, the parties can order a

19   transcript.  Or if Marvel would like to summarize those rulings

20   in a proposed order and submit for the Court's consideration,

21   they can do that as well.

22          Before the parties leave the telephonic hearing, do

23   Counsel have any questions in terms of what the Court has

24   ordered, so that the Court can clarify that sooner rather than

25   later, and not -- not create additional confusion?

27

1          **MS. LENS:**  None from Marvel, Your Honor.  Thank you

2  very much.

3          **MR. TOBEROFF:**  This is Marc Toberoff on behalf of the

4  Defendants.  My -- first of all, thank you for your thoughtful

5  and very detailed response to the motions.

6          My concern is that (indisc.) the meet-and-confer

7  exchange letters and (indisc.) meetings, as the Court

8  recognized there, that has it -- there are things that could be

9  easily resolved in the meet-and-confer process that have not

10 been.

11         But after so much effort, that's the precise reason

12 we brought the motion.  And now I'm concerned, frankly, with

13 timing.  Because the discovery cutoff is in November.

14         So my overall concern has to do with sort of the --

15 your thoughts and order have been very constructive.  But I'm

16 worried about the teeth.  I'm worried about the time where

17 discovery cutoff is in November.

18         And so how does it work if we are blocked in the

19 meet-and-confer process?

20         **THE COURT:**  Well, I can offer three thoughts that

21 might be helpful.

22         One, sometimes when parties have a difficult time

23 engaging in what they feel is a civil or productive meet-and-

24 confer process, the Court has opened up the courtroom or a

25 conference room, and the parties have met here.

28

1          And that tends to have people on their best behavior

2    and come prepared.  And sometimes more is accomplished than

3    might have been if the parties were just exchanging emails,

4    which is rarely a productive way to meet and confer.

5          So that is an option that is available if the parties

6    thing that that would ultimately save time.

7          With respect to the discovery cutoff date, the

8    Magistrate Judge doesn't control that, because it can affect

9    the trial date, which is an important date on the District

10   Judge's calendar.

11         If the parties look at the facts before then and

12   earnestly believe that they can't get done what they need to

13   get done in terms of exchanging relevant information before the

14   discovery cutoff, then they can present a stipulation to the

15   District Judge asking to extend that date.

16         The District Judge will be looking for good cause to

17   do that.  But if the parties believe that they can establish

18   good cause, then they can go ahead and, you know, proceed in

19   that way.

20         And I know I said, "three."  Maybe I have another

21   idea.  Oh, I know the third idea I had in mind was that the

22   Court does have a procedure for resolving smaller discrete

23   discovery issues with abbreviated briefing.

24         And so it's -- you know, after results of meeting and

25   conferring, there is really unresolved issues over research

1    terms, for example.  And someone can articulate, in two pages

2    or less, why these search terms are necessary.  And someone

3    else can articulate why they are not appropriate or are going

4    to yield unwieldy results or overly inclusive results.  Then

5    the parties can use that procedure.

6         That procedure is intended to be far more nimble than

7    a typical Rule 37 Motion in that it can be, you know, a hearing

8    date simply reserved by contacting the Court.  The briefs are

9    filed 24 hours in advance.  And then we have the hearing the

10   next day.

11        Because it is a short period, it's not a process that

12   is appropriate for lengthy discovery motions or discovery

13   motions that involve, you know, voluminous exhibits.

14        But if there is indeed some sort of discrete problem

15   that remains unresolved, that's an option for getting a

16   judicial resolution far more quickly, and then allowing the

17   discovery process to go forward based on that decision.

18        **MR. TOBEROFF:**  Thank you, Your Honor.

19        **MS. LENS:**  Thank you, Your Honor.

20        **THE COURT:**  All right.  Well, we will go ahead and

21   adjourn then.

22        **MS. LENS:**  All right.  Thanks so much.

23        **MR. TOBEROFF:**  Good day.  Thank you.

24       **(Proceedings Concluded)**

25

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.


_____                    September 8, 2022

          Signed                                        Dated


*TONI HUDSON, TRANSCRIBER*